Javier JIMENEZ, Plaintiff,

v.

The CITY OF NEW YORK, Defendant.

No. 06–CV–15255 (CM).

United States District Court,
S.D. New York.

March 19, 2009.

Pamela Denise Hayes, Law Office of Pamela D. Hayes, Esquire, New York, NY, for Plaintiff.

Andrez Shumree Carberry, New York City Law Department, New York, NY, for Defendant.

DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge:

Plaintiff Javier Jimenez ("Jimenez" or "Plaintiff"), currently a Deputy Director of Contracts for the City of New York Department of Housing Preservation and Development ("defendant" or "HPD") commenced this action against his employer for discrimination based on his race, age, and national origin for denial of over thirty promotions that he applied for at HPD, despite allegedly being more qualified than most of the hired candidates. The complaint alleges that defendant (i) discriminated against plaintiff on account of his race, age, and country of origin in violation of 42 U.S.C. § 1981, Title VII, and the Age Discrimination in Employment Act (ADEA), by, among other things, (a) failing to promote him to any of the 33 positions for which he applied over a three-year span, (b) denying him the opportunity to interview for all but two of these positions, and (c) filling the vacancies with younger and/or non-Hispanic candidates under the guise that plaintiff was not as qualified as the successful hires; (ii) discriminated against plaintiff on account of his race, age, and national origin in violation of the New York City Admin. Code § 8–107 et seq. ("NYCHRL") by engaging in these same practices; (iii) subjected plaintiff to a hostile work environment because of these practices; and (iv) retaliated against plaintiff in violation of Title VII and New York City Admin. Code § 8–107 et seq. by continuing to deny Jimenez any of the promotions he applied for after he submitted his EEOC charge and assigning the plaintiff a new job title demanding expanded duties without a promotion or an increase in pay. The defendant has moved for summary judgment dismissing plaintiffs complaint. For the following reasons, the defendant's motion is granted in part and denied in part.

## BACKGROUND

### A. The Parties

Plaintiff Javier Jimenez is a male who was 51 years old at the filing of this lawsuit in December 2006, Jimenez is of Hispanic race and Puerto Rican national origin. Plaintiff is fluent in Spanish and resides in Brooklyn, New York. (Def. Mem., Ex. C.) Jimenez has a Bachelor's degree in Business Administration and a Master's degree in Public Administration from the University of Puerto Rico. (*Id.*) Plaintiff also has credits towards a Ph.D in Public Administration, majoring in Human Resources Management—Labor Relations at New York University. (*Id.*)

After passing a civil service exam, Plaintiff began working for HPD in 1992. He has held various job titles and responsibilities throughout his tenure: Director of the Weatherization Program and Deputy Director of the 7A Counseling Program; Deputy Director of Special Projects for the Division of Anti–Abandonment; and, since approximately February 2007, Deputy Director of Contracts for the Division of Neighborhood Preservation. (Def. R. 56.1 Stmt. ¶¶ 2, 3; Carbine Decl. ¶ 4.) In Plaintiff's current position of Deputy Director of Contracts, among other duties and responsibilities, Jimenez assists in the management of 42 contracts between HPD and community groups through New York City that assist in providing housing services to residents; Jimenez also oversees the Greenpoint/Williamsburg initiative, which seeks to help tenants in danger of being displaced because of extensive development in those neighborhoods. (Def. R. 56.1 Stmt. ¶ 3; Jimenez Dep. 34:10–35:17.)

Throughout his tenure at HPD, Plaintiff has assumed various other responsibilities, such as coordinating Tax Lien Sale building evaluations, analyzing Tax Lien Sale building data and generating management reports, and supervising Real Property Managers to ensure compliance with relevant housing codes, laws and regulation. (Def. Ex. C.) Plaintiffs resume lists other qualifications he possesses, including leading community development and housing programs in the private and public sector; serving as an official translator as designated by the New York City Mayor's Office of Immigrant Affairs and Language Services; and launching, completing, and managing large scale City and State funded programs. (*Id.*)

As of June 29, 2008, Plaintiff received a salary of $73,415 for his work as Deputy Director of Contracts. (Def. Ex. KKK.) In July 2004, as a Deputy Director of Special Projects, Plaintiff received a salary of $57,310. He received five pay increases during these four years. (*Id.*)

Defendant City of New York is a municipal corporation incorporated in New York State.

## B. The Facts

### 1. Plaintiff's Discrimination Claims—Failure to Promote Claims

#### i. 33 Positions Plaintiff Allegedly Applied For and Did Not Receive

In his Complaint, Plaintiff alleges that, from 2003 through 2006, he applied for numerous promotions and/or vacancies and was denied all those positions because of a discriminatory animus on the part of decision-makers at HPD, based on his to race, age, and national origin. (Compl. ¶ 11–40; Def. R. 56.1 Stmt. ¶ 4.) Plaintiff claims that no older Hispanic men were hired for any of these positions. (Pl. Ex. 36; Pl. Resp.

R. 56.1 Stmt. ¶ E.) The complaint alleges that HPD kept Plaintiff in the same position, without a promotion, under the guise that he was not as qualified as each of the successful candidates. (Compl. ¶ 8.)

It is undisputed that two of the thirty-three job postings, 806–06–055 and 806–06–108, were not filled. (Def. R. 56.1 Stmt. ¶¶ 126, 127, 146, 147.) Accordingly, no one was promoted or hired for either of these positions and they drop out of this lawsuit. (*Id.*)

In both parties' Local Rule 56.1 Statements, they address what they perceive to be the justification/pretext (depending on who is speaking) for denying Jimenez any of the promotions for which he allegedly applied, beginning with job posting 806–04–038 in December 2003 through job posting 806–06–010 in August 2005. (Def. R. 56.1 Stmt. ¶¶ 8–112; Pl. Resp. R. 56.1 Stmt. ¶¶ 8–112.) The same is true for the postings for which Plaintiff allegedly applied following his submissions for job postings 806–06–038 and 806–06–052 in January 2006. (Def. R. 56.1 Stmt. ¶¶ 126–189; Pl. Resp. R. 56.1 Stmt. ¶¶ 126–189) For each filled vacancy, defendant asserts that the best candidate was hired for the position based on the requirements that the position entailed. (Def. R. 56.1 Stmt. ¶¶ 8–112, 126–189). The defendant also claims "at no time in the selection process, did race, national origin or age of the prospective candidates play any role in ... [the] decision making process." (*Id.*)

With respect to the Plaintiff, defendant claims that nearly all of those responsible for reviewing applicants' materials had no recollection of reviewing or receiving any application materials from Plaintiff. However, upon review of his resume and qualifications, defendant proffers various reasons why Jimenez was not best suited for the job. (*Id.*)

Needless to say, Plaintiff disputes defendant's evidence on various grounds. (Pl. Resp. R. 56.1 Stmt. ¶¶ 8–112, 126–189). For example, he argues that certain job postings expressed that a preference would be given to bilingual candidates, yet defendant was passed over for non-Hispanic hires. Job Posting 806–04–090 for Deputy Director of the LEAD COTA Squad stated "preference given to candidates with bi-lingual skills." (Def. Ex. I). HPD hired Mr. Michael Murphy, a white male who is not bilingual, for the position. (Pl. Resp. R. Stmt. 56.1 ¶ 25). Rassoul Azarnejad, in charge of the hiring process for this position for HPD, claimed that Plaintiff does not have certification as a lead inspector, while Mr. Murphy does. (Azarnejad Decl. ¶¶ 6, 7). Plaintiff contends that the job posting did not require experience in code enforcement, and argues that bilingual candidates like himself could have been trained, thereby making him suitable for this position. (Pl. Resp. R. Stmt. 56.1 ¶ 25).

On or about May 17, 2005, Job Vacancy Notice 806–05–198 was posted for Deputy Director of Special Projects in the Division of Anti–Abandonment. (Def. Ex. HH.) Plaintiff hand-delivered his application to his supervisor. (Jimenez Dep. 44:4–7.) The defendant claims that Plaintiff was actually promoted to the position. (Def. R. 56.1 Stmt. ¶ 105.) Plaintiff testified that he was not interviewed for the position and that he was not actually "promoted," because he had been performing these very duties without an increase in pay already for three years, "without getting anything in terms of monetary terms." (Jimenez Dep. 44:8 to 45:5.) Jimenez admitted that he was notified of his change in title and also an increase in pay but claims that this

was done "nonchalantly" and "informally". (Jimenez Dep. 45:12–21.)

Defendant contends that many of those responsible for making hiring decisions were over the age of forty and/or Hispanic, like Deputy Commissioner Luiz Aragon, who hired for the position of Director of Operations for the Housing Education Services Program and Lead Education Program ("HESLEP"), job posting 806–04–0146. (Aragon Decl. ¶¶ 2–7.) "At no time in the selection process, did race, national origin or age of the prospective candidates play any role in my decision making process. In fact, I was forty-four years old when I made the decision to hire Ms. Booker, and I also am of Hispanic heritage." (*Id.* at ¶ 7.) Plaintiff suggests that Mr. Aragon is neither Hispanic nor Latino but is from Brazil, a non-Spanish speaking country. (Pl. Resp. R. Stmt. 56.1 ¶ 46.)

Candidates for job posting 806–06–180 were reviewed by Ms. Miriam Colon, a Puerto Rican who was 56–years old at the time. (Colon Decl. ¶ 8.) Ms. Colon, selected Ms Elaine Toribio to fill the vacant position. (*Id.*) Plaintiff contends that Ms. Toribio is the only Hispanic to receive a promotion for any of the positions that Jimenez applied. (Pl. Resp. R. Stmt. 56.1 ¶ 179.)

The Plaintiff submits a chart providing what he contends is a breakdown of race and gender of the successful hires for twenty-six of the positions for which Plaintiff allegedly applied.[1] (Pl. Ex. 36.) The race and gender of the hire, as provided by the Plaintiff, is as follows: nine white women (35%), seven white men (27%), two Asian women (7%), six African–American women (24%), one African–American man (3%), one Hispanic woman (3%), and no Hispanic men. (*Id.*)

1. The chart accounts for twenty-six of the thirty-three positions in dispute because two positions were not filled and "five positions did not submit a deposition." This statement is incomprehensible because a position cannot submit a deposition.

The defendant submitted declarations from Deputy Commissioner of Administration Bernard Schwarz and Assistant Commissioner William Carbine, attesting to nine instances between 2003 and 2007 when HPD either hired or promoted Hispanic applicants to supervisory and managerial positions. (*See* Schwarz Decl. in Further Support of Def. ¶ 2; Carbine Decl. in Further Support of Def. ¶ 6.)

## 2. Hostile Work Environment Claim

Plaintiff also claims that the defendant's failure to promote him to any of the aforementioned positions amounted to working in a hostile environment, "I contend that the systematic exclusion of Latino/Hispanic males in thirty-three job postings has created a hostile work environment which has caused me and others similarly situated to remain track in the same position, while others of different races, national origins, as well as younger ages, have been allowed to advance." (Jimenez Decl. ¶ 11.) A portion of Plaintiff's testimony during his deposition regarding his hostile work environment claim reads as follows:

Q: What led you to believe that you were subject to a hostile work environment?

A: As we have seen here, it is pretty hostile when you keep on applying for jobs and you do not get the benefit of an interview.

Q: Has anyone ever referred to you by any discriminatory names or phrases in the office?

A: No, what I mentioned to you in the past in terms of E.E.C. practices and policies, they have guidelines. In my experience, it is in the hiring and advancement.

Q: So is that the basis for your belief that you were subjected to a hostile work environment that you were not advanced or promoted; is that what you are saying?

A: That is part of it that, you know, it is hostility.

Q: Is there anything else?

A: Not at this time.

(Jimenez Dep. 150:22–151:12.)

The plaintiff also testified about various remarks allegedly made towards him that he suggests amount to being subjected to a hostile work environment. For example, after applying for a position as director of operations in the division, Mr. William Carbine allegedly stopped Jimenez in the hallway and said "How dare you apply for the job." (Jimenez Dep. 174:14–176:8.) Defendant argues that Plaintiff's allegations are not consistent with the theory of a hostile work environment and that his testimony negates such a theory.

## 3. Retaliation Claim

Plaintiff alleges that defendant HPD refused to promote him to any of the vacancies for which he applied after May 11, 2006, as retaliation for his submission of an EEOC complaint about HPD's allegedly discriminatory conduct. Plaintiff further alleges that after a mediation before the EEOC, Plaintiff was transferred and given additional responsibilities, but with the same pay and title. (Pl. Resp. K. 56.1 Stmt. ¶ 1.)

In or about January 2007, Mr. William Carbine, Assistant Commissioner for Neighborhood Preservation for HPD ("Carbine"), claims that he recommended that Jimenez be transferred to Deputy Director of the Contracts Division, based on Carbine's awareness of Plaintiffs interest in a position with additional responsibilities. (Carbine Decl. ¶ 2.) However, Carbine further asserts, "I did not recommend that [Jimenez] receive any change in salary as a result of his transfer to the Contracts Division, because at that time his performance did not warrant it, and I

wanted to assess his performance in the new position as Deputy Director of Contracts." (*Id.* at ¶ 3.) After sixteen months in his new position, Jimenez was given a raise based upon a determination that Jimenez had been performing his tasks in a manner that warranted a pay increase. (*Id.* at ¶ 4; Def. Ex. KKK.)

Plaintiff testified that he believes he was retaliated against because, "I was being responsible in materials of preparing reports and correspondence and so on; but now I'm responsible for six million dollars so there was no compensation, nothing to that effect. So any responsibility was increased exceptionally. There was no economic contribution, no." (Jimenez Dep. 141:5–10). Asked why that constituted retaliation, Jimenez answered, "Well, usually when people get an increase on their responsibilities, they get an increase on their paycheck." (Jimenez Dep. 141:13–14.)

#### 4. Relief Requested

Plaintiff contends that defendant's discrimination against him caused him both emotional and monetary damages. (Jimenez Decl. ¶ 12.) With respect to monetary damages, Jimenez testified that his pay stubs are evidence of damages he has suffered based on this alleged discrimination. (Jimenez Dep. 165:2.) Plaintiff admits that he has never seen a psychologist or psychiatrist, or received any medication for psychological ailments. (Jimenez Dep. 166:1–5.) However, Jimenez contends that the alleged discrimination affected his confidence, his self-esteem, and has been both depressing and stressful. (Jimenez Dep. 166:19.) He further testified that, because he did not receive these promotions, "You just feel you are different, a change in moods and I handle it." (Jimenez Dep. 166:23.)

In his complaint, Plaintiff seeks relief including: 1) a permanent injunction preventing defendant from engaging in any employment practice which discriminates on the basis of race or age; 2) an order requiring defendant to hire Plaintiff to one of the positions for which he was not selected, with the seniority, status, salary, increments, bonuses and benefits as though he had been the original hire; 3) an order requiring defendant to interview and consider Plaintiff for future promotions 4) an order requiring the defendant to carry out policies that provide equal employment opportunities for Latinos as well as older Americans; 5) an order requiring defendant to make Plaintiff whole, by providing back-pay with pre-judgment and post-judgment interest; 6) an award of compensatory damages in the amount of $500,000.00; 7) an award of punitive damages, 8) reasonable attorney fees; and 9) costs and fees incurred in pursuing this litigation. (Compl. ¶¶ A–I.)

### C. Procedural History

#### 1. EEOC proceedings

On May 11, 2006, Plaintiff filed a charge of discrimination based on race, age, and national origin with the U.S. Equal Employment Opportunity Commission ("EEOC") (Def. Ex. D.) The charge explicitly alleged discrimination in connection with two promotions the Plaintiff unsuccessfully sought—one for Assistant Commissioner in the Division of Anti–Abandonment, the other for Director of Planning and Administration in the Division of Anti–Abandonment. The jobs were posted from November 2, 2005 to November 25, 2005 and December 27, 2005 to January 18, 2006, respectively. (*Id.*) The Plaintiff claims that HPD discriminatorily "selected candidates for both positions [who] were younger white males with less formal education, training, and work experience than me." (*Id.* at ¶ 4.)

In addition to these two instances, the charge alludes to twenty occasions during

the years 2004–2006 when Plaintiff submitted his resume for positions at HPD that were "filled by white males and females with less formal education and work experience, who are younger than me." (*Id.* at ¶ 5.) The charge also alleged that Plaintiff was performing translation work for HPD without additional compensation, while outside vendors were still being hired to provide similar services:

> On January 18, 2006, I was requested to do a translation for the Third Party Transfer Program and on that day at 5:30 p.m., I was informed by Ms. Susan Carr, the Director of Operations; that they would not be able to pay for this translation work. She mentioned this was due to budget problems. On March 7, 2006, the Director of Administrative Services, Ms. Roberta Mason, came to my office and informed me that the First Deputy Commissioner hired a translator. However, the first translation that was done by this outside vendor was wrong and he was given a second translation to do. At that time, Ms. Mason requested that I review and revise the second translation without pay.

(*Id.* at ¶ 6.)

On September 27, 2006, the EEOC closed its file after determining that the evidence provided did not establish a violation of race, age, or national origin discrimination. It issued a notice of right to sue. (Def. Ex. E)

### 2. This action

Plaintiff filed the complaint in this action on December 18, 2006. In his complaint, Plaintiff alleges that Defendant (i) discriminated against Plaintiff on account of his race, age, and country of origin in violation of 42 U.S.C. § 1981, Title VII, and the Age Discrimination in Employment Act (ADEA); (ii) discriminated against plaintiff on account of his race, age, and national origin in violation of the New York City

Admin. Code § 8–107 et seq.; (iii) subjected plaintiff to a hostile work environment; and (iv) retaliated against Plaintiff in violation of Title VII and New York City Admin. Code § 8–107 et seq. following the filing of Plaintiff's EEOC Charge of Discrimination.

## DISCUSSION

### A. Standard of Review

Under Fed.R.Civ.P. 56(c), a party is entitled to summary judgment if the moving party establishes that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. "[T]he moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). The court will "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor ... and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and quotations omitted).

In Title VII and ADEA discrimination cases, the plaintiff bears the burden of introducing evidence that would, if credited, establish every element of his *prima facie* case. The plaintiff must show "1) that be belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of dis-

crimination." *Feingold v. New York,* 366 F.3d 138, 152 (2d Cir.2004). In the context of discriminatory hiring, the plaintiff's *prima facie* case requires that he show (i) that he belonged to a protected class; "(ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the plaintiff meets that minimal burden, the defendant must come forward with a legitimate non-discriminatory reason for taking the action it took. At that point, the burden shifts back to the plaintiff to prove, with evidence and not conclusory supposition, that the defendant's articulated rationale is a pretext for discrimination. *Id.* at 806, 93 S.Ct. 1817. The plaintiff, with admissible evidence, "must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Feingold,* 366 F.3d at 152. Although Plaintiff has brought claims under NYC Administrative Code § 8–107, such claims are subjected to the same *McDonnell Douglas* parameters. *See Knight v. New York City Housing Authority,* 2007 WL 313435, at *10 (S.D.N.Y.2007) (applying *McDonnell Douglas* analysis to claims brought under New York City Administrative Code).

■ Claims brought under 42 U.S.C. § 1981 are also analyzed under the *McDonnell Douglas* framework and do not include claims of age discrimination. Additionally, in order to hold a municipal defendant liable under this statute, a plain-tiff "must show that the violation of his § 1981 'right to make contracts' was caused by a custom or policy." *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 702, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).

## B. Applications, With Proper Evidence, That Are at Issue Before the Court

Defendant concedes that Jimenez meets the first prong of a *prima facie* case because he is a member of a protected class.

■ The second element of a *prima facie* case for failure to promote is that the candidate applied for the job and was rejected. This requirement "cannot be established merely with evidence that a plaintiff generally requested promotion consideration. A specific application is required. . . ." *Petrosino v. Bell Atlantic,* 385 F.3d 210, 227 (2d Cir.2004). The specific application requirement may be excused only if the employee demonstrates that "(1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." *Id.* Jimenez bears the burden of identifying the jobs for which he applied or for which he had an open application that was sufficiently denied. Statements that Jimenez applied for positions contained in Plaintiff's Local Rule 56.1 Statements does not suffice. Plaintiff must offer evidence, in the form of testimony (including his own) or documents that demonstrate he applied for the position in question.

The failure to promote claims listed in Plaintiff's Complaint for which evidence has been offered are the following:

| Positions | Approximate Application Date | Citation to the Record |
|---|---|---|
| Admin. Staff Analyst (806–02–057) | Feb. 2002 | Jimenez Dep. 116:17 |
| Admin. Staff Analyst (806–02–062) | 2002 | Jimenez Dep. 118:15 |
| Dir. of Staffing Management, HPD (806–04–038) | Dec. 2003 | Jimenez Dep. 80:1–9 |
| Dir. of Operations, Housing Education Services Unit (806–04–078) | Mar. 2004 | Jimenez Dep. 83:9–19 |
| Deputy Dir., LEAD COTA Squad (806–04–090) | Mar. 2004 | Jimenez Dep. 89:16–21 |
| J–51 Lead Coordinator for the Tax Incentive Programs (806–04–101) | Mar. 2004 | Def. Ex. J; Uncontested, Def. Mem. p. 15 n. 10 |
| Special Assistant to the Chief of Staff (806–04–115) | 2004 | Uncontested, Del. Mem. p. 15 n. 10 |
| Dir. of Operations, HESLEP (806–04–146) | June 2004 | Jimenez Dep. 101:21–25 |
| Assistant Commissioner, Division of Alternative Management Programs (806–05–021) | Aug. 2004 | Jimenez Dep. 130:19–23 |
| Dir. of Third Party Transfer (806–05–046) | Dec. 2004 | Jimenez Dep. 27:19 |
| Dir. of Policy Analysis and Operations (806–05–137) | Mar. 2005 | Jimenez Dep. 35:18; Uncontested, Def. Mem. p. 15 n. 10 |
| Dir. of Administration (806–05–155) | Apr. 2005 | Jimenez Dep. 42:17; Uncontested, Def. Mem. p. 15 n. 10 |
| Associate Staff Analyst (Assistant to the Deputy Commissioner), Housing Operations (806–06–010) | September 1, 2005 | Jimenez Dep. 47:13–48:8 |
| Admin. Project Manager MI (806–05–015) | Aug. 2005 | Jimenez Dep. 113:16 |
| Assistant Commissioner, DAA (806–06–038) | Nov. 22, 2005 | Jimenez Dep. 50:13–52:22 |
| Dir. of Planning and Administration, DAA (806–06–052) | Jan. 17, 2006 | Jimenez Dep. 58:24–59.25; Pl.Ex. 18 |
| Dir. of Support Services (806–06–093) | Mar. 2006 | Jimenez Dep. 72:10–72:15 |
| Housing Development Specialist L–2, Dir. (Dir. of SCRIE) (806–06–147) | May 2006 | Jimenez Dep. 85:3–24; Pl. Ex. 27 |
| Assistant Commissioner, DAA (806–06–136) | May 2006 | Jimenez Dep. 87:23 |
| Legislative Assistant, Division of Policy and Program Analysis of HPD (806–06–170) | June 19, 2006 | Jimenez Dep. 94:15; Pl. Ex. 39 |
| Dir. of Policy Analysis and Operations (806–06–180) | June 2006 | Jimenez Dep. 95:19–96:20 |
| Project Manager, NYCHA Collaboration Program (806–06–189) | July 17, 2006 | Jimenez Dep. 100:5; Pl. Ex. 32 |

That is a total of twenty-two separate job listings. The rest of the eighteen job listings listen in Exhibit A to Plaintiff's Complaint are unsupported by *any* evidence—even from Plaintiff—that Jimenez submitted an application. There is no sworn testimony, concession or documentation provided before the Court that Plaintiff applied for any of these promotions. Accordingly, Jimenez has failed to make out a *prima facie* showing of a discriminatory failure to promote him to these positions and defendant's motion for summary judgment for these jobs is granted.

There is evidence in the record that Plaintiff applied for positions 806–06–055 and 806–06–108. However, it is undisputed that the defendant did not fill either of these positions. (Musco. Decl. ¶¶ 3, 5.) Therefore, Plaintiff fails to establish the

fourth prong of a failure to promote claim; in neither situation did the position "remain[ ] open and the employer continue[ ] to seek applicants." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir. 1998).

### C. Timeliness of Claims

### 1. Statute of Limitations Time Bars Job Postings Relating to Plaintiffs Title VII and ADEA Claims That Occurred 300 Days Prior to Filing of EEOC Charge

As the Plaintiff concedes, the Title VII and ADEA claims based on job postings for which Plaintiff allegedly applied more than 300 days prior the May 11, 2006 (the date he filed his EEOC Charge) are time barred and must be dismissed. In this dual filing state, the statute of limitations extends back 300 days from the filing of the charge. As the charge was filed on May 11, 2006, claims relating to discrete acts of discrimination that occurred prior July 15, 2005 are time barred under Title VII and the ADEA. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 109, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Each instance of a failure to promote is considered a discrete act. Therefore, the Plaintiff is precluded from pursuing any claims under Title VII or the ADEA for promotions for which he applied or allegedly applied prior to July 15, 2005.

This leaves Plaintiff with the following claims: (1) the failure to promote claims under Title VII and the ADEA for job postings dating from July 15, 2005 through May 11, 2006 including job postings 806–06–038 and 806–06–052 that were explicitly mentioned in the EEOC Charge, (2) the failure to promote claims under Title VII and the ADEA for job postings that postdate the filing of Plaintiff's EEOC Charge, (3) the § 1981 discrimination claims for job postings that occurred no earlier than De-

cember 18, 2002, four years before this suit was filed, (4) the hostile work environment claim, (5) the post-EEOC Charge retaliation claim, and (6) the New York City Admin. Code § 8–502(d) discrimination claims for job postings that occurred no earlier than December 8, 2003, three years before this suit was filed.

### 2. Promotions That Plaintiff Applied for or Allegedly Applied for July 15, 2005 Through May 11, 2006 and After May 11, 2006 are Not Time Barred Under Title VII and the ADEA

■ In his EEOC Charge, Plaintiff claims that he was discriminated against because of various job promotions to which he applied and did not receive. He explicitly refers to his application for Assistant Commissioner in DAA (806–06–038) and Director of Planning and Administration in DAA (806–06–052). He further alleges, in his EEOC Charge, that:

> on twenty different occasions, 11 resumes were submitted in 2004, 4 resumes were submitted in 2005, and so far 6 resumes have been submitted in 2006, I have applied for listed positions in the agency's website. Invariably these positions have been filled by white males and females with less formal education and work experience, who are younger than me.

(Def. Ex. D.)

■ Claims not explicitly mentioned in the EEOC charge may still be tried if the claims are based on conduct that occurred subsequent to the EEOC filing, or if the claims are "reasonably related" to what was alleged in the EEOC charge. *Butts v. N.Y.C. Dep't of Hous. Pres. and Dev.*, 990 F.2d 1397, 1401–02 (2d Cir.1993). The Charge specifies only two specific instances when Plaintiff was not promoted. There were seventeen other instances

where Plaintiff claims to have applied for jobs in the 300 days prior to the filing of the charge that were not specifically identified in the charge. And there were three instances that occurred after the charge was filled.[2] Defendant argues that the court lacks jurisdiction to hear these charges because Plaintiff failed to exhaust his administrative remedies. Defendant is wrong. This court has jurisdiction to hear claims based on all applications submitted on or after July 15, 2005 (300 days before the EEOC charge) because these claims were mentioned on the face of the EEOC complaint and also because they are reasonably related to the two postings explicitly mentioned in the EEOC charge, as claims that were "carried out in precisely the same manner as the claims alleged in the EEOC charge." *Id.* at 1402–03. Furthermore, all promotions that the Plaintiff applied for after May 11, 2006 can be heard under the "reasonably related" rule. *See id.* at 1401–02.

### 3. Section 1981 and NYCHRL Claims Have a Four–Year and a Three–Year Statute of Limitations, Respectively

■ Employment discrimination claims under section 1981, which provides a separate and independent remedy from Title VII, have a four-year statute of limitations from the filing date of the law suit. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382–83, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004). Furthermore, there is no exhaustion requirement.

The complaint in this action was filed on December 18, 2006. Therefore, the Plaintiff is precluded from pursuing any claims under section 1981 for promotions for which he applied or allegedly applied before December 18, 2002. That bars only one or two of his claims.

NYCHRL allows a party three years from the date of any alleged discriminatory act to file suit. N.Y. City Admin. Code § 8–502(d); *Milani v. Int'l Bus. Machines Corp., Inc.*, 322 F.Supp.2d 434, 451 (S.D.N.Y.2004) (noting that NYCHRL is subject to a three-year statute of limitations). Since Plaintiff filed suit on December 18, 2006, all alleged denials of promotion that occurred prior to December 18, 2003, are time barred by the NYCHRL.

### 4. Timeliness of Claims Under Each Statute Before the Court

To summarize, this court may hear Plaintiff's failure to promote claims for positions to which he applied where the claim is timely, indicated by an "X" in the chart below.

| Positions | Approximate Application Date | Title VII and ADEA Claims | § 1981 Claims | NYCHRA Claims |
|---|---|---|---|---|
| Admin. Staff Analyst (806–02–057) | Feb. 2002 | | | |
| Admin. Staff Analyst (806–02–062) [3] | 2002 | | | |
| Dir. of Staffing Management, HPD (806–04–038) | Dec. 2003 | | X | X |
| Dir. of Operations, Housing Education Services Unit (806–04–078) | Mar. 2004 | | X | X |

**2.** I am assuming that the two jobs of which Plaintiff applied in May 2006 were pre-charge, though that is not clear.

**3.** I do not know the exact date after Plaintiff applied for this position but it is Plaintiff's burden to prove that he falls within the statute and he has not done so.

| | | | | |
|---|---|---|---|---|
| Deputy Dir., LEAD COTA Squad (80–04–090) | Mar. 2004 | | X | X |
| J–51 Lead Coordinator for the Tax Incentive Programs (806–04–101) | Mar. 2004 | | X | X |
| Special Assistant to the Chief of Staff (806–04–115) | 2004 | | X | X |
| Asst. Commissioner, Division of Alternative Management Programs (806–05–021) | Aug. 2004 | | X | X |
| Dir. of Third Party Transfer (806–05–046) | Dec. 2004 | | X | X |
| Dir. of Policy Analysis and Operations (806–05–137) | Mar. 2005 | | X | X |
| Dir. of Administration (806–05–155) | Apr. 2005 | | X | X |
| Associate Staff Analyst (Asst. to the Deputy Commissioner), Housing Operations (806–06–010) | Sept. 1, 2005 | X | X | X |
| Admin. Project Manager MI (806–05–015) | Aug. 2005 | X | X | X |
| Asst. Commissioner, DAA (806–06–038) | Nov. 22, 2005 | X | X | X |
| Dir. of Planning and Administration, DAA (806–06–052) | Jan. 17, 2006 | X | X | X |
| Dir. of Support Services (806–06–093) | Mar. 2006 | X | X | X |
| Housing Development Specialist L–2, Dir. (Dir. of SCRIE) (806–06–147) | May 2006 | X | X | X |
| Asst. Commissioner, DAA (806–06–156) | May 2006 | X | X | X |
| Legislative Asst., Division of Policy and Program Analysis of HPD (806–06–170) | June 19, 2006 | X | X | X |
| Dir. of Policy Analysis and Operations (806–06–180) | June 2006 | X | X | X |
| Project Manager, NYCHA Collaboration Program (806–06–189) | July 17, 2006 | X | X | X |

**Alleged Discrete Acts**

### C. Failure to Promote Claims: Analysis of Evidence

Every employee of the defendant who made the decision to hire another candidate, rather than promote Jimenez, contends that at no time in the selection process, did race, national origin or age of the prospective candidates play any role in the decision making process. Plaintiff contends that defendant's witnesses are simply giving conclusory and self-serving testimony. To determine whether the defendant's motion for summary judgment should be granted, a record and subsequent review of each alleged discrete act of employment discrimination is required.

### 1. Selection of Karin Allen for Director of Staffing Management, HPD (806–04–038)

In or about December 2003, Jimenez contends that he applied for the vacant Director of Staffing Management position at HPD. (Jimenez Dep. 80:1–9.) The Plaintiff met the job posting's minimum qualifications because he held a master's degree in public administration and had two years of satisfactory full-time professional experience "working with the budget of a large public ... concern." (Def. Ex. F; Def. Ex. C.) According to the posting, the hired person would be responsible for supervising numerous areas within Human Resources, including the Central Liaison Unit, Data Entry Unit, Verification Unit and Special Employment

Programs. (Def. Ex. F.) The person who oversees all aspects of the hiring and promotion of individuals in the Staffing Management unit is Bernard Schwarz, Deputy Commissioner of Administration of HPD. (Schwarz Decl. ¶ 1.) Schwarz was sixty years old at the time of the employment decision. (Schwarz Decl. ¶ 7.)

Schwarz offered the position to another candidate, Karin Allen—a female whom Schwarz believed to be over forty years old. (*Id.* at ¶¶ 4, 7.) Schwarz testified that Allen was best qualified for the job, citing her "over fifteen years experience in personnel and staff management" and that, as Assistant Director Ms. Allen was "an outstanding employee, with superb technical knowledge of human resources and staffing matters including the New York Civil Service Laws." (*Id.* at ¶ 5.) Schwarz worked directly with Allen during that period. (*Id.*)

Schwarz does not remember receiving or reviewing Jimenez's application for the position. However, then presented with Plaintiffs resume, he notes "it is devoid of any substantial Human Resources experience, and also lacks substantive experience with the civil service laws or other personnel rules and regulations." (*Id.* at ¶ 6.)

Jimenez contends that the job posting ended on a Friday and that Ms. Allen received a salary increase the following Monday. (Pl. Resp. R. Stmt. 56.1 ¶ 11.) He asserts that Schwarz never intended to hire anyone but Ms. Allen, a white female, for this position. (*Id.*) Plaintiff further asserts that defendant has offered no proof that Ms. Allen was over forty at the time the decision was made. (Pl. Resp. R. Stmt. 56.1 ¶ 13.) He does not dispute that he lacks HR experience or experience with Civil Service laws and personnel regulations.

### 2. Selection of Karen Mayo for Director of Operations, Housing Education Services Unit (806–04–078)

Around March 1, 2004, Plaintiff contends that he applied for a promotion to the position of Administrative Staff Analyst (non managerial). (Jimenez Dep. 83:9–19.) Defendant contends that job posting 806–04–078 was for an existing position—Director of Operations for the Housing Education Services Unit—which, due to a regulatory change, underwent significant increases in responsibilities, warranting a reevaluation of compensation level. (Booker Decl. ¶ 2.) The Plaintiff met the job posting's minimum qualifications because he had a master's degree in public administration and more than two years of satisfactory full-time experience, eighteen months of which in a supervisory capacity. (Def. Ex. G; Def. Ex. C.) The job listing stated that the hired candidate would oversee all activities related to the Unit's Lead Component with regard to personnel, budgetary, purchasing and facilities management functions. (Def. Ex. G.)

Director of Operations Karen Booker, who reviewed resumes, interviewed candidates and selected the final hire, sought a candidate who would "serve as the Unit's database administrator for the Lead Component, which included all the mandatory reporting, maintaining a comprehensive database, issuing and maintaining copies of certificates for 8,000 to 24,000 students per year, while supervising approximately fifty-six employees." (Booker Decl. ¶ 3.) These qualifications were not mentioned in the job listing. (Def. Ex. R.)

Ms. Booker ultimately selected Ms. Karen Mayo to fill the vacancy. (*Id.* at ¶ 5.) Booker is an African American woman who was forty-seven years old at the time of her decision to hire Ms. Mayo. Mayo is also an African American woman and

Booker believes her to be over forty. (Booker Decl. ¶¶ 8–9.)

Booker contends that she interviewed both Mayo and Jimenez for the position. (Def. R. Stmt. 56.1 ¶ 19) After doing so she concluded that Mayo was the best candidate for the position, because "She had a superb history in the agency as a Director of Administration for several large property management units." (Booker Decl. ¶ 6.) Booker noted that Jimenez "did not have the experience in budgeting, nor any extensive computer knowledge and had skills more suitable to being a trainer or a person who could assist in writing a curriculum but not as a Director." (Booker Decl. ¶ 17.)

Jimenez disputes Booker's assertion. He admits discussing teaching a Spanish class at night with Booker, but denies being interviewed for the position. (Pl. Resp. R. Stmt. 56.1 ¶ 18.) Plaintiff testified that he believes he was discriminated against because "someone made a comment that, you know, the person in charge of the housing education services she was intent in bringing African Americans under her umbrella and that is what she was interested in hiring and then upon personal observation that is what I noticed." (Jimenez Dep. 84:19.) Plaintiff concluded, "Just by the comment it leads you to infer being that I am not African American that is why I didn't get the position." (Jimenez Dep. 86:12.) Plaintiff does not identify the person who allegedly made the comment.

With respect to his age, Plaintiff believes he was discriminated against in this position because "You would see the people they were bringing into the area were younger than 1 was, that is how you would see it. You would go and see it and there is pretty much evidence there." (Jimenez Dep. 87:20.)

### 3. Selection of Michael Murphy for Deputy Director, LEAD COTA Squad (806–04–090)

In or about March 2004, Jimenez contends that he applied for the vacant Deputy Director of the LEAD COTA Squad position. (Jimenez Dep. 89:16–21.) The Plaintiff met the job posting's minimum qualifications because he held a master's degree in public administration, had two years of satisfactory full-time professional experience "working with the budget of a large public ... concern," and eighteen-months of supervisory experience in areas specified in the job listing. (Def. Ex. I; Def. Ex. C.) The hired candidate would be responsible for overseeing the management activities of inspectors and clerical staff in creating and implementing agency procedures and regulations pertaining to lead-paint hazards. (Def. Ex. I.) The Deputy Director was also responsible for overseeing outreach to owners once orders to abate were forwarded. (*Id.*) The position also entailed ensuring that all inspection procedures are followed and properly documented. (*Id.*) The posting explained that "candidates will be trained as an EPA certified Risk Assessor through the Agency within 4 months of employment" and that "preference [is] given to candidates with bi-lingual skills." (*Id.*)

The person who reviewed and selected candidates to interview was Rassoul Azarnejad, who is of Iranian national origin and was forty-nine years old at the time of the employment decision. (Azarnejad ¶¶ 5, 8.) After Azarnejad made his selection, Assistant Commissioner Jose Torres and Azarnejad interviewed applicants and selected the most qualified candidate. (Azarnejad Decl. ¶ 6.) Jimenez was not interviewed for the position. (Jimenez Dep. 94:4.)

Azarnejad offered the position to another candidate, Michael Murphy—a white male whom he believed was also

over the age of forty. (*Id.* at ¶¶ 4, 7, 8.) Azarnejad claims that Murphy was best qualified for the job. The job was code enforcement intensive (pursuant to a new regulation) and Murphy, "had extensive experience in the field, having worked in the asbestos program with me.... In addition, Mr. Murphy had the requisite federal Lead Inspector certification coupled with years of lead inspection and environmental knowledge." (*Id.* at ¶ 6.) While Mr. Azarnejad does not remember receiving or reviewing Jimenez's application for the position, upon later reviewing Plaintiff's resume, he notes that it was "devoid of any experience in code enforcement or with lead inspections, and did not indicate he possessed the requisite Lead Inspection Certification." (*Id.* at ¶ 7.)

Jimenez contends that the job posting did not specify that experience in code enforcement was a requirement. (Pl. Resp. R. Stmt. 56.1 ¶ 22; Def. Ex. I.). Jimenez testified that he heard unidentified people, some of whom are decision-makers for positions (but not for this position) made statements that, "If you're not white you don't get too far here no matter what qualifications you may have." (*Id.* at 93:13.)

With regard to his national origin, Plaintiff testified "you can come back to some areas and you see it is heavily, you know, Italian males," and from his observation "that area was really heavily Italian, white males." (*Id.* at 95:7.) Jimenez said with respect to age, "seeing the people and going down to the fourth floor and seeing the makeup around, you just don't see people that look like you." (*Id.* at 95:20.)

Mr. Jimenez is unaware of the age of the hired candidate, Mr. Murphy.

**4. Selection of Elizabeth Zeldin for J–51 Lead Coordinator for the Tax Incentive Programs ("TIP") (806–04–101)**

In or about March 2004, Jimenez contends that he applied for the vacant position of J–51 Lead Coordinator for the Tax Incentive Programs. (Def. Mem. p. 15 n. 10.) The Plaintiff met the job posting's minimum qualifications because he held a master's degree in public administration, had two years of satisfactory full-time professional experience "working with the budget of a large public ... concern," and eighteen-months of supervisory experience in areas specified in the job listing. (Def. Ex. J; Def. Ex. C.) The hired candidate would be responsible for creating the forms and processes that would be required and added to the already functioning J–51 program. The successful candidate would also spend considerable time implementing the New York City Council's lead paint abatement law, and train and supervise staff in the new procedures. (Yee Decl. at ¶ 3.) The job description on the posting entailed extensive tax-specific duties such as drafting required amendments to the J–51 regulations, revising program procedures and forms for implementations of new tax benefits, and coordinating modifications to existing software needed for processing tax benefits with TIP. (Def. Ex. J.)

Mr. Yonatan Jacobs, a human resources representative who was familiar with the skills HPD sought for this job, first reviewed the initial applications and then forwarded a list of candidates to Ms. Lisa Yee, the decision-maker, who was fifty-two years old at the time of this vacancy. (*Id.* at ¶¶ 4–5.) Yee then interviewed applicants and selected Ms. Elizabeth Zeldin, a white female. (*Id.* ¶ 1, 5.)

Yee claims that Ms. Zeldin was best qualified for the job because of her extensive writing and analytical experience which she gained while working with the New York City Independent Budget Office. (*Id.* at ¶ 6; Def. Ex. K.) Ms. Yee

further noted Zeldin's international work on municipal finance, concluding that she was a "very interesting person who would be able to quickly assess the needs of the agency and the program." (*Id.*) While Ms. Yee does not recall receiving or reviewing Jimenez's application for the position, upon later reviewing Plaintiff's resume, she notes "it does not reflect that he had superior writing experience, which was an essential component of the job." (*Id.* at ¶ 7.)

Jimenez contends that he does have the extensive writing skills necessary for this position; he writes documents, pamphlets, manuals, letters for the agency and has the ability to write in both Spanish and English. (Pl. Resp. R. Stmt. 56.1 ¶ 31.) Furthermore, Plaintiff contends that Ms. Yee's observation that Ms. Zeldin was "interesting" does not demonstrate that she was the best candidate. (*Id.*) Jimenez testified that he believes he was discriminated because of his race because "Again, if you do go up there and take a look around . . . you see basically mostly white people." (Jimenez Dep. 100:7) With respect to national origin, Jimenez testified that he does not have anything that he can prove. (*Id.* at 102:8.) Regarding his claim of age discrimination, Mr. Jimenez stated "Again, you see, you know younger people are being selected for jobs, you go up to the ninth floor and start seeing the makeup of the people and you see younger people up there." (*Id.* at 102:16.) Finally, Plaintiff asserts that there is no sworn testimony from Mr. Jacobs, who screened the candidates before Yee interviewed them. (Pl. Ex. 4 ¶ 9.)

### 5. Selection of Katherine McCracken for Special Assistant to the Chief of Staff (806–04–115)

In or about April 2004 Jimenez contends that he applied for a newly created Special Assistant to the Chief of Staff position. (Def. Mem. p. 15 n. 10.) The Plaintiff met the job posting's minimum qualifications because he held a master's degree in public administration and more than one year of satisfactory full-time professional experience "working with the budget of a large public . . . concern." (Def. Ex. L; Def. Ex. C.) The job listing stated that the hired candidate would be responsible for researching and writing memos, speeches and testimony for the Commissioner/Chief of Staff and assisting the Chief of Staff on priority projects and reviewing and responding to intra-divisional and inter-agency issues that are of immediate concern. (Def. Ex. L.; Yee Decl. at ¶ 3.)

Chief of Staff Laurel Blatchford reviewed all resumes submitted for the position and interviewed candidates she believed had the most applicable skills and experience. (Blatchford Decl. at ¶ 5.) Ms. Blatchford declared that she "sought an individual who had experience working with high-level agency executives and politicians in varying branches of City government and sister agencies." (*Id.* at ¶ 4.)

Blatchford claims that Katherine McCracken was best qualified for the job. Ms. McCracken's resume indicates that she served as Press Secretary for the Holden for Governor Campaign in Missouri, the Director of Scheduling and Media Strategy for Governor Holden and Special Assistant to the Press Secretary for New York City's Department of City Planning. (Def. Ex. M.) Blatchford claims McCracken, a white female, was best suited for the position because of her "significant experience as a Press Secretary in varying governmental capacities, and was an individual who had a very good understanding of what the other City agencies were doing and inter-agency ·dynamics, including the varying policy makers at City Hall." (Blatchford Decl. at ¶ 6.)

While Ms. Blatchford does not recall receiving or reviewing Jimenez's applica-

tion for the position, upon later reviewing Plaintiffs resume, she notes "he does not possess the level and extent of writing experience and correspondence with high level government officials that I sought for this position." (*Id.* at ¶ 7.) Ms. Blatchford continues in her declaration that "plaintiff's experience, while admirable was more programming and operational in nature, and did not reflect the level of exposure to policy making or political sensitivity I sought in the successful candidate." (*Id.*)

Plaintiff contends that the job posting did not specify that the candidate have experience working with high level agency executives and politicians in various branches of City government, a quality that Ms. Blatchford declared she sought in a successful candidate. (Pl. Resp. R. Stmt. 56.1 ¶ 36; Def. Ex. L.) Regardless, without specifying, Plaintiff argues that he performed the type of work she sought. (Pl. Resp. R. Stmt. 56.1 ¶ 36; Def. Ex. C.) Plaintiff also argues that Ms. McCracken was not the best candidate because she had been in New York for only two years. (Pl. Resp. R. Stmt. 56.1 ¶ 38.)

The Plaintiff testified that he was not promoted due to his race because, "Again, she was hired and advanced to this position and I wasn't and I was even willing to go below my civil service title and it didn't even happen, so again, it is a pattern here. You go up, you go down, nothing happens." (Jimenez Dep. 110:9.) With respect to discrimination based on his national origin, Jimenez testified, "Again, I saw her and I know she is not Puerto Rican so that sort of lead me to believe that, you know." (Jimenez Dep. 111:12.) As to Plaintiff's age discrimination claim, he believes that Ms. McCracken was in her 20s at the time of her hiring and that Ms. Blatchford was approximately thirty-three. (Jimenez Dep. 110:15; 112:2.)

### 6. Selection of Karen Booker for Director of Operations, Housing Education Services Program and Lead Education Program (806–04–146)

In or about June 2004 Jimenez contends that he applied to become the Director of Operations for HESLEP, a position that underwent a reassessment of duties and responsibilities. (Jimenez Dep. 101:21–25.) The Plaintiff met the job posting's minimum qualifications because he held a baccalaureate degree in public administration and had more than three-years of work experience, including at least 18 months of supervisory experience. (Def. Ex. N; Def. Ex. C.) The job listing stated that the hired candidate would be responsible for designing educational programs to ensure the proper repair and management of city-owned and privately-owned property in compliance with housing codes and other environmental health mandates. (Def. Ex. N; Aragon Decl.) Furthermore, the job entailed overseeing the recruitment, training, assignment and management of all HESLEP staff, as well as representing HPD to other institutions. (*Id.*)

Deputy Commissioner Luiz Aragon received the resumes of candidates who met the basic credentials for the position from his personnel division and then interviewed candidates. (Aragon. Decl. ¶ 4.) Mr. Aragon declared that he is of Hispanic heritage and was forty-four years old at the time of this incident. (*Id.* at ¶ 7.)

Aragon claims that Ms. Karen Booker was best qualified for the job. Booker, the incumbent, because had been successfully performing the duties and responsibilities of the position since 2001, and had worked in that position since 1994. (*Id.* at ¶ 5; Booker Decl. ¶ 1; Def. Ex. O.) While Booker was the incumbent, a posting was nonetheless prepared in accordance with relevant human resource directives so that individuals could have an opportunity to

apply for the position. (*Aragon Decl. n. 1.*) Aragon further asserts that, "I personally had the opportunity to supervise Ms. Booker, and knew that her knowledge and skill ... [pertaining to the job] were superb. She also was an excellent supervisor." (*Id.* at ¶ 5.)

While Mr. Aragon does not recall receiving or reviewing Jimenez's application for the position, upon later reviewing Plaintiffs resume, he remarks that Jimenez, "has no substantive experience handling large real property dispositions, or health mandates associated with such position. Furthermore, plaintiff lacked experience in Operations." (*Id.* at ¶ 6; Def. Ex. C.)

Plaintiff disputes Aragon's declaration and alleges that Ms. Karen Mayo (an African–American female), not Ms. Booker, actually received this position, although his allegation is conclusory and unsupported. (Pl. Resp. R. Stmt. 56.1 ¶ 44.) Plaintiff alleges that there was previously no "HESLEP," therefore Booker could not have been the incumbent, (*Id.* at ¶ 41.) Plaintiff also argues that Mr. Aragon is from Brazil, a non-Spanish speaking country, and so is not Hispanic. (*Id.* at ¶ 46.)

### 7. Selection of Wendell Walters for Assistant Commissioner, Division of Alternative Management Programs (806–05–021)

In or about August 2004 Jimenez contends that he applied for the vacant Assistant Commissioner, Division of Alternative Management Programs position. (Jimenez Dep. 130:19; Def. Ex. R.) The Plaintiff met the job posting's minimum qualifications because he graduated from an accredited college and had more than four years of progressively responsible supervisory full-time professional experience in a field related to urban development projects. (Def. Ex. R; Def. Ex. C.) The job listing stated that the hired candidate would be responsible for participating in the formulation of policy for the administration of programs in the City's comprehensive neighborhood redevelopment initiative designed to spur neighborhood growth by returning City-owned in-rem buildings to responsible private owners.

Associate Commissioner Anne–Marie Hendrickson, who reviewed resumes, interviewed candidates and selected the final hire, sought a successful candidate "with background in implementing the disposition of City owned property, capable of multi-tasking effectively, be a good communicator, articulate, possess prior managerial experience, capable of working flexible hours including late nights, familiar with Federal and City policies, and prior experience working with low income housing tax credits ..." (Hendrickson Decl. ¶ 4.) Plaintiff also notes that the qualifications deemed essential by Hendrickson were not mentioned in the job listing. (Def. Ex. R.) Hendrickson ultimately selected Wendell Walters to fill the vacancy. (*Id.* at ¶ 5.) Hendrickson is a black woman of West Indian national origin, Walters is a black man. (*Id.* at ¶¶ 8–9.)

Hendrickson declared that Walters was the best candidate for the position because "he had been the Director of the Neighborhood Entrepreneur Program, and as such was responsible for one of the largest units in the division for approximately six years." (*Id.* at ¶ 6.) Hendrickson further declared that, as Walters' direct supervisor, she was very familiar with Walters' work and found him to be articulate, well respected, a hard worker with a good reputation and capable of working flexible hours. (Hendrickson Decl. ¶ 6; Def. Ex. S.)

While Ms. Hendrickson does not recall receiving or reviewing Jimenez's application for the position, upon later reviewing Plaintiffs resume, she explained that it

"did not reflect any experience or background in disposition, nor any experience in the process of getting buildings renovated and sold to the private sector. While plaintiff possessed admirable skills, he also had no experience running some of the larger programs in the units to which he was previously assigned." (Hendrickson Decl. at ¶ 7.)

Plaintiff contends that Walters was not the most qualified individual for the position. (Pl. Resp. R. Stmt. 56.1 ¶ 56.) He states that, in Walters' previous position, Walters selected individuals to manage and own in-rem city properties, while Plaintiff gained identical expertise through the 7A programs (where the properties were owned by private owners rather than the city). (*Id.*) Plaintiff also stresses that he has more expertise within HPD, is bilingual, and has translated documents for this specific program. (*Id.* at ¶ 58.) Jimenez contends that if he was given an interview, maybe it would have been clear that he was the more qualified candidate. (*Id.*)

### 8. Selection of Sara Oerth for Director of Third Party Transfer (806–05–046)

In or about December 2004, Jimenez contends that he applied for the vacant position of Director of Third Party Transfer. (Jimenez Dep. 27:19.) The Plaintiff met the job posting's minimum qualifications because he held a master's degree in public administration and had more than two-years of satisfactory full-time professional experience "working with the budget of a large public . . . concern," including at least eighteen months of supervisory experience. (Def. Ex. Z; Def. Ex. C.) The job listing stated that the hired candidate would have numerous responsibilities, including (a) overseeing the prequalification process for entities eligible for designation as new owners, including drafting and issuing RFQs and evaluating the experience and qualifications of the applicants to establish qualified owners' panel, (b) preparing City land use approval submissions and working to marshal agency recommendations through the City Council approval process, (c) coordinating with rehabilitation financing programs on underwriting, design, tenant and other pre-financing issues. (Def. Ex. Z; Gribbin Decl. ¶ 3)

All resumes were forwarded to Ms. Susan Ponce De Leon (now deceased), who interviewed the qualified candidates and made a recommendation to Assistant Commissioner Aileen Gribbin. (Gribbin Decl. ¶ 4.) Gribbin selected Sara Oerth, who she testified, was recommended by Ponce De Leon. She claims Oerth was the best candidate for the job because she had "invaluable" experience in the Participation Loan Program, the primary source of funding for the TPT program. (*Id.* at 5.) Gribbin also declared that she "had known Oerth for several years as a subordinate in her division and knew her to be a very hard worker, with excellent computer skills and experience." (*Id.* at ¶ 6; Def. Ex. AA.) While Ms. Gribbin does not recall receiving or reviewing Jimenez's application for the position, upon later reviewing Plaintiff's resume, she remarks that Jimenez, "possessed no lending experience, and therefore would have required extensive training, including underwriting training, to get him up to speed on the operation of the unit at a time when I sought a candidate who could take control of the program with minimal interruption." (Gribbin Dec. ¶ 6; Def. Ex. C.)

Jimenez testified that he never received an interview for this position, even though he applied on four different occasions. (Jimenez Dep. 26:6.) Jimenez explained that he did nighttime translation work for TPT and had acquired first hand knowledge about the program by so doing. (Jimenez 29:3, Plaintiff Resp. R. Stmt. 56.1

¶ 83.) Jimenez believes he was discriminated based on his race because, "Well, this one, you know, as I said this one I have applied for four times and every time it has been the same, younger people, you know, white and again, the pattern you just see it, it is everything." (Jimenez Dep. 27:19.) Plaintiff argues that because Ms. Ponce De Leon is now deceased, there is no insight to the screening process, and any statements made by Gribbin that Ponce De Leon recommended Ms. Oerth is hearsay. (Pl. Resp. R. Stmt. 56.1 ¶ 83.)

### 9. Selection of David Rouge for Director of Policy Analysis and Operations (806–05–137)

In or about March 2005, Jimenez contends that he applied for a newly created Director of Policy Analysis and Operations position. (Jimenez Dep. 35:18.) The Plaintiff met the job posting's minimum qualifications because he held a baccalaureate degree and four years experience in city planning (Def. Ex. DD; Def. Ex. C.) The job listing stated that the hired candidate would be responsible for developing and supervising the implementation of administrative, personnel, budget, policy, and planning initiatives, and provide analysis and recommendations for the implementation of new division related initiatives and evaluation and oversee the division's priority projects and work with the Assistant Commissioner to define these goals. (Def. Ex. DD.)

Assistant Commissioner Timothy O'Hanlon selected who he claimed to be the most experienced and best-suited candidate for the position, David Rouge. (O'Hanlon Decl. at ¶ 4.) O'Hanlon declared that Mr. Rouge had "successfully performed the duties of that position in this division for several years and was knowledgeable as to the unique work this division does." (Id. at ¶ 6.) Furthermore, O'Hanlon explained that Mr. Rouge was a competent and very efficient employee whom he had directly supervised for over ten years. (Id.)

While Assistant Commissioner O'Hanlon does not recall receiving or reviewing Jimenez's application for the position upon later reviewing Plaintiff's resume, he acknowledged that Mr. Jimenez has a long history of working within HPD, but has no prior experience with the unique work done in SPHN. (See id. at ¶ 7.)

Jimenez contends that this was a clear manipulation of job postings in the agency because it was pre ordained that Mr. Rouge, a male, non-Hispanic, non-Latino would be selected for this position. (Pl. Resp. R. Stmt. 56.1 ¶¶ 95, 97.) The only evidence Jimenez about his race is "Again, you know, you go, you know, it is just the same pattern you go up there and you just see faces that don't look like your face." (Jimenez Dep. 38:12.) Jimenez testified that there was nothing that led him to believe that he was not promoted to this position because of his age. (Jimenez Dep. 38:24.)

### 10. Selection of Dawn Naidu–Walton for Director of Administration (806–05–155)

In or about April 2005, Jimenez contends that he applied for the vacant position of Director of Administration and received a letter indicating that defendant received his resume. (Jimenez Dep. 42:17.) The Plaintiff met the job posting's minimum qualifications because he held a master's degree in public administration, more than two years of satisfactory full-time professional experience "working with the budget of a large public ... concern," and more than eighteen months of this experience in an supervisory capacity. (Def. Ex. FF; Def. Ex. C.) The job listing stated that the hired candidate would be responsible for supervising all aspects of employee discipline at HPD, including the

management of three employees charged with investigating allegations of employee misconduct and incompetence, reviewing those findings, overseeing the drafting of charges, and representing HPD at internal and external hearings. (Def. Ex. FF; Schwarz Decl. ¶ 9–10.)

Deputy Commissioner Schwarz reviewed all the resumes submitted for the position, interviewed candidates and then selected the person he claims was the most experienced and best candidate for the position, Dawn Naidu–Walton. (Schwarz Decl. ¶ 11.) Schwarz declared that Ms. Naidu–Walton had "extensive experience in personnel and staff management, discipline and labor relations experience, both at HPD and as Deputy Director of Personnel for the City of Kissimmee, Florida." (Schwarz Decl. ¶ 12; Def. Ex. GG). Furthermore, Schwarz explained that he had previously supervised Naidu–Walton and regarded her to be a "successful and highly motivated employee, who also served as the Assistant Director of Staff Management reporting directly to the Director of Staff Management." (Id. at ¶ 12.) Schwarz continued that Naidu–Walton had extensive experience of the internal workings of HPD as well as superb knowledge of human resources and staffing matters, including the New York Civil Service Law. (Id.)

Naidu–Walton is a black woman. (Schwarz Dep. Pl. Ex. 40.) Schwarz testified that he believed she was in her "late 40s, maybe early 50s" (Id.)

While Mr. Schwarz does not recall receiving or reviewing Jimenez's application for the position, upon later reviewing Plaintiff's resume, he explained that it "reflects no experience in implementing the New York Civil Service Laws or other personnel rules and regulations, nor did plaintiff's resume reflect any experience or knowledge of disciplinary matters." (Id. at ¶ 13; Def. Ex. C.)

Plaintiff contends that whether Ms. Naidu–Walton was best qualified for this position is disputed because at Schwarz's deposition he did not remember if he interviewed anyone else for the position. (Pl. Resp. R. Stmt. 56.1 ¶ 102; Schwarz Dep. Pl. Ex. 40.) Jimenez testified he believed that he was not promoted to this position because of his race because, "Again you keep on seeing the same pattern repeating itself." (Jimenez Dep. 42:14.) Plaintiff expressed similar sentiments with respect to his age and national origin in his deposition. (Id.) He offered no other evidence.

## 11. Selection of Kathleen Mullin for Associate Staff Analyst (Assistant to the Deputy Commissioner) for Housing Operations (806–06–010)

On or about September 1, 2005, Jimenez contends that he applied for the vacant position of Associate Staff Analyst (Assistant to the Deputy Commissioner) for Housing Operations. The posted salary range for the position was from $49,778 to $74,118 per annum. (Def. Ex. II.) (Jimenez Dep. 47:13.) The Plaintiff met the job posting's minimum qualifications because he held a master's degree in public administration and more than one year of satisfactory full-time professional experience "working with the budget of a large public ... concern." (Def. Ex. II; Def. Ex. C.) The job listing stated that the hired candidate would be responsible for assisting the Deputy Commissioner in the management of functional areas within the Division of Tenant Resources (DTR) and for performing extensive monitoring and analysis of various DTR units including quality assurance and continued occupancy. (Def. Ex II.) In addition the job entailed researching and preparing responses to correspon-

dence from politicians, community members and community organizations. (*Id.*)

Deputy Commissioner Laurie LoPrimo, who declared in her sworn affidavit that this was an "entry level position," received a list of candidates whose resumes reflected the requisite background and experience. (LoPrimo Decl. ¶ 4.) LoPrimo then interviewed candidates and selected Kathleen Mullin, who she claims was the best candidate for the position. (*Id.*) Ms. LoPrimo was forty-two years old at the time of this decision. (*Id.* at ¶ 7.) LoPrimo declared that Mullin was the best candidate because she "was very well educated, was a very effective communicator, excellent writer and she was well suited for an entry level position of this nature." (*Id.* at ¶ 5.)

While LoPrimo does not recall receiving or reviewing Jimenez's application for the position, upon later reviewing Plaintiff's resume, she explained that "it is clear to me that he was already functioning as a Deputy Director. Therefore, in my estimation, this position was below his level of experience and skills." (*Id.* at ¶ 6; Def. Ex. C.)

Plaintiff testified that he believes he was discriminated based on his race, age, and national origin for the same patterns as the previous hires. (Jimenez Dep. 49:4–23.) Plaintiff stresses that the posting does not list this "entry level" and that it would not have been a demotion because Plaintiff was only making $58,000, substantially less than the top possible pay of $74,118 per annum.

### 12. Selection of Juliet Cullen–Cheung for Administrative Project Manager M1 (806–05–015)

In or about August 2005, Jimenez contends that he applied for the vacant Administrative Project Manager M1 position. (Jimenez Dep. 113:16; Def. Ex. P.) The Plaintiff met the job posting's minimum qualifications because he held a baccalaureate degree in public administration and more than four years of satisfactory full-time professional experience in public administration, at least two years of which were directly related to neighborhood improvement. (Def. Ex. P; Def. Ex. C.)

The job listing stated that the hired candidate would be responsible for working with varying agency offices to develop a clear picture of the pipeline and analysis of where the agency stood relative to the New Marketplace Plan Goals and would assist the Deputy Commissioner and others in the development of new financing tools for meeting the Mayor's supportive housing goals and provide necessary research, modeling and financial analysis in support of this effort. (Def. Ex. Q.) Former Deputy Commissioner Rafael Cestero (who is Hispanic) also sought an individual who had "experience working with the varying real estate financing tools and programs because a tremendous amount of the candidate's time would be spent running financial figures." (Cestero Decl. ¶¶ 3, 7.)

All resumes were collected and vetted by members of Cestero's staff, who made recommendations about whose resumes best fit the criteria laid out for the position. (*Id.* at ¶ 4.) Cestero then interviewed several candidates and selected the best candidate for the position, Juliet Cullen–Cheung. Cestero declared that Ms. Cullen–Cheung was the best candidate for the position because "she had successfully spent years working in the Division of Housing Finance, in HPD performing real estate finance which was the exact experience and skill set I sought in the successful candidate." (Cestero Decl. ¶ 5; Def. Ex. Q.) Cestero went on, "Moreover, Ms. Cullen–Cheung had received glowing remarks from all her superiors and was re-

garded as a rising star in the agency, especially as it pertained to real estate finance and was an individual I believed could seamlessly transition into the position." (*Id.*)

Cestero does not recall receiving or reviewing Jimenez's application for the position, upon later reviewing Plaintiff's resume, he explained, "It is apparent that [Jimenez] has the experience of doing the MMR indicator reports, but he has absolutely no real estate experience or investment experience, or any experience running spreadsheets on the type of analytical data this position entailed." (Cestero Decl. ¶ 7; Def. Ex. C.)

Plaintiff points out that the job posting did not place any special emphasis on finances. (Pl. Resp. R. Stmt. 56.1 ¶ 48, Def. Ex. P.) However, he admits that Ms. Cullen–Cheung was "pretty good" and "kind of an academic type." (Jimenez Dep. 128:3–21.) He contends that "she was working towards a master's at the point and I had ... at least all the course work towards a PhD, plus years of experience in the agency, it should count for something." (*Id.*) Plaintiff contends that Ms. Cullen–Cheung was maybe twenty-eight or twenty-nine years old. (Jimenez Dep. 130:1.) Plaintiff also observes that there are no declarations from the staff members who were initially involved in the selection process, and asserts that it is impossible to know who actually passed on the qualification of various candidates. (Pl. Resp. R. Stmt. 56.1 ¶ 49.)

Jimenez believed he was discriminated against because, "Again, just seeing her and seeing the previous ones and just seeing the systemic pattern. Someone said the other day, well, you know, walks like a dog—walks like a dog it is a dog." (Jimenez Dep. 130:6–9.)

### 13. Selection of David Pechefsky for Assistant Commissioner, Division of Anti–Abandonment (806–06–038)

In or about November 2005, there was a vacancy for the position of Assistant Commissioner of HPD's Division of Anti–Abandonment. (Def. R. 56.1 Stmt. ¶ 114; Jimenez Dep. 50:13–52:22.) The posted salary range for this position was from $80,000 to $110,000 per annum. (*Id.*) Responsibilities set forth in the job description included: oversight for forty-two not-for-profit housing organizations, Administrative Services, Field Operations (which includes four borough offices and Owner Services Program), identifying potentially distressed buildings and developing treatment plans to reverse their distress, and coordinating and managing Mayoral Preservation Initiatives, such as the Bushwick Initiative and Predatory Lending. (*Id.*) The defendant concedes that Jimenez met the minimum requirements for this position. (Def. Mem. 13–14.)

The job posting directed applicants to submit resumes to Ms. Susan Carr, Director of Operations. (*Id.*) Resumes were then forwarded to Luiz Aragon, Deputy Commissioner of HPD for review who interviewed several candidates and then forwarded applications to First Deputy Commissioner John Warren. (Def. R. 56.1 Stmt. ¶ 116.) Plaintiff testified that he applied for the position on November 22, 2005. (Jimenez Dep. at 52:4–5.) On December 29, 2005 Plaintiff sent Ms. Carr an e-mail inquiring about the status of his candidacy:

> I submitted my resume for the above referenced position. As of today, I have not received a letter or telephone call regarding the application. I will appreciate an update on the application status.

(Pl. Ex. 18.) Plaintiff claims that he did not receive a response from Ms. Carr by e-

mail or when he saw her in person. (Def. Ex. D.)

Mr. David Pechefsky, a white male under forty years of age who worked in the finance division at the New York City Council (Warren Decl. ¶ 13; Def. Ex. LL; Pl. Resp. R. 56.1 Stmt. ¶ 117) was selected by Warren to fill the position. Plaintiff was not interviewed for the position. (Def. R. 56.1 ¶ 118.) Mr. Pechefsky's salary nearly doubled from $58,000 to $100,000, when he assumed his new position. (Pl. Ex. 16, 17.)

Warren cites Mr. Pechefsky's 1) six years experience with the City Council Division dealing with housing policy matters, 2) previous work with not-for-profit entities with which HPD traditionally works, 3) extensive knowledge of the City's contractive and budget process, 4) close work with HPD managerial staff, 5) well-respected reputation by HPD's top management, and 6) direct work with Michael Bosnick, the outgoing Assistant Commissioner of DAA, as reasons why he was the best candidate for the position. (Warren Decl. ¶ 13.)

Warren asserts that Jimenez's application was never presented to him, but upon review, "he has far less experience with the community groups, shows no substantive experience in financial and budgetary matters at the level this position required, and lacked knowledge of the City's tax policies." (Warren Decl. ¶ 14.)

Plaintiff alleges that "while Mr. Pechefsky might have done some of these duties in the City Council, it was not the same as Plaintiff performing these duties within the agencies." (Pl. Resp. R. 56.1 Stmt. ¶ 116.)

On May 11, 2006, Plaintiff filed an EEOC Charge of Discrimination. (Pl. Ex. 1.) He cited this job posting as an instance of race, national origin, and age discrimination. (*Id.*) Jimenez was asked whether anything led him to believe that he was not promoted to this position because of his race during his deposition. He responded, "I was part of this division since its creation over 10 years ago. Again by seeing David Pechefsky selected it was quite evident that that was why I was not selected." (Jimenez Dep. 55:18–23.) Plaintiff testified that he believed he was not promoted due to his national origin because "again, they were not from my national origin," (Jimenez Dep. 56:5.) With respect to his belief that he was not promoted to this position because of his age, Jimenez testified "Again David is younger than I am." (Jimenez Dep. 56:11.)

**14. Selection of Ben Celaj for Director of Planning and Administration, Division of Anti–Abandonment (806–06–052)**

In or about December 2005 a position Director of Planning and Administration for HPD's Division of Anti–Abandonment was created. (Def. R. 56.1 Stmt. ¶ 120.) The posted salary range for this position was from $79,000 to $90,000 per annum. (*Id.*) Responsibilities set forth in the job description included: supervising staff who compile and analyze data for varying bi-weekly and other program monitoring reports, coordinating the overall management of the Mayoral Predatory Lending Mayoral Initiative, assisting the Assistant Commissioner with planning and development of DAA's long-term and short-term strategies, planning new DAA programs and marketing efforts such as loans to owners for avoiding potential predatory loans, and preparing correspondence for the Assistant Commissioner's signature. The job posting stipulated:

> Experience gained as a real estate broker, real estate salesperson, manager of real estate, or similar experience which is primarily involved with the sale, lease,

rental, or managing of real estate, or experience which is primarily involved with the monitoring of construction, is *not* acceptable.

(Def. Ex. MM.)

The job posting directed applicants to submit resumes to Ms. Susan Carr, Director of Operations. (*Id.*) Minimally qualified candidates were then forwarded for consideration to Assistant Commissioner Pechefsky, who, along with Ms. Carr, interviewed candidates. (Def. R. Stmt. ¶ 122). Plaintiff testified that he applied for the position on January 17, 2006. (Jimenez Dep. at 59:22.)

Mr. Ben Celaj, a white male under aged forty, was ultimately selected by Pechefsky to fill the position. (Pl. Resp. R. 56.1 Stmt. ¶ 124.) Mr. Celaj's salary increased from $25,000 to $80,000 in his new position. (Pl. Ex. 21, 22, 23.)

Pechefsky claims Mr. Celaj was the best candidate for the position because of his work as a property manager in public and private real estate firms and service as a member on New York City Tax Commission, which involved reviewing real estate taxes. (Pechefsky Decl. ¶ 5; Def. Ex. NN.)

Plaintiffs resume was not forwarded along to Mr. Pechefsky; accordingly, he was not interviewed for the position. (Def. R. 56.1 ¶ 124.) However, the defendant concedes that Jimenez met the minimum requirements for this position. (Def. Mem. 13–14.) Upon reviewing Plaintiff's resume, Mr. Pechefsky noted that it "does not reflect substantial experiences with building finances." (Pechefsky Dec. ¶ 6.) Plaintiff claims that "knowledge of building finances were not required for this position; however, Plaintiff had building finance knowledge." (Pl. Resp. R. Stmt. 56.1 ¶ 124) (internal citations omitted).

Plaintiff alleges that Mr. Celaj could not have been the most qualified candidate because his commercial real estate background was explicitly *not* a qualification for the promotion. (Pl. Resp. R. Stmt. 56.1 ¶ 123.)

However, once again, at his deposition, Plaintiff testified that he was not promoted to this position because "You see the same pattern, you know, white male, female, younger being promoted to positions." (Jimenez Dep. 62:5–8.) Plaintiff also commented about how he had to train Mr. Celaj for his new position:

> When Mr. Celaj got appointed, he—you know, basically you get these people coming in and you have to basically train them, you know, sort of like bring them up to speed and stuff as to what is really going on. So not only you do not get the interview, not only you get passed over and on top of it you have to train the people. Which, you know, again, I'm a professional, 1 train and they were really—you know, they were really happy that I was, you know, helping them, because someone under the circumstances would not have behaved the same way.

(Jimenez Dep. 63:9–18.)

### 15. Selection of Grace DeFina for Director of Support Services (806–06–093)

In or about March 2006 Jimenez contends that he applied for the newly created Director of Support Services position. (Jimenez Dep. 72:10.) The Plaintiff met the job posting's minimum qualifications because he held a master's degree in public administration, more than two years of satisfactory full-time professional experience "working with the budget of a large public ... concern," and eighteen-months of supervisory experience in areas specified in the job listing. (Def. Ex. RR; Def.

Ex. C.) The job posting also listed "preferred skills":

1) Knowledge of, and the ability to interpret the New York State Multiple Dwelling Law, City Charter, New York City Housing Maintenance Code and other Federal, State and Local laws and regulations governing the safe occupancy, proper maintenance and preservation of residential buildings.

2) Ability to prepare and discuss comprehensive and complex reports.

(Def. Ex. RR.) The posting stated that the hired candidate would be responsible for, among other things, planning and coordinating the efforts of the Enforcement Services program units, preparing directives and procedures pertaining to program activities and planning initiatives, restructuring staffing operation to meet the requirements of new legislative and administrative mandates, and representing the Department at public hearings with other agencies and organizations. (*Id.*) Associate Commissioner Vito Muscaciulo received a list of qualified candidates after they were collected and vetted by members of the division's human resources staff.[4] (Muscaciulo Decl. ¶ 16.) Muscaciulo then interviewed candidates and selected Grace DeFina, whom he claims was the most qualified candidate for the position. (*Id.*) Mr. Muscaciulo was 44 years old at the time of this decision. (*Id.* at ¶ 20.)

Muscaciulo declared that DeFina "possessed all the experience and preferred skills I sought in the successful candidate" (*Id.* at ¶ 17; Def. Ex. RR.) Muscaciulo noted that DeFina was an attorney in the division that he supervised and played an integral role in the restructuring of the Division of Code Enforcement. (*Id.*) Muscaciulo went on to say that he often called upon Ms. DeFina to write and edit complex proposals to conform to legislative guidelines and that her law degree set her apart from other candidates. (*Id.*) Last, Muscaciulo declared that DeFina had a unique knowledge of what this position entailed and could supervise in this capacity without delay. (*Id.*)

While Mr. Muscaciulo does not recall receiving or reviewing Jimenez's application for the position, upon later reviewing Plaintiff's resume, he explained that Jimenez "has no experience working with or in any of the units this position would be called upon to supervise and would not be able to effectively transition into the position without extensive retraining." (Muscaciulo Decl. ¶ 19.) The Assistant Commissioner continued, "Furthermore, plaintiff did not possess any of the preferred skills I sought in the successful candidate as detailed ... in the Vacancy Notice ... nor did he possess any code enforcement experience or sufficient knowledge of the housing maintenance code."

Plaintiff testified that this position "is working under Vito, you know, as I mentioned in the past when you go to the area of, you know code enforcement, you know, it is basically white Italian males. So there is like a concentration there." (Jimenez Dep. 72:17.) Plaintiff believes he was discriminated on the basis of his race because

---

4. Defendant contends that two of the three members of the staff that vetted candidates, Gisela Ruiz and Cindy Ramos, are Hispanic. (*Id.* at ¶ 4 n. 1; 16.) Plaintiff disputes this asserting, contending that Cindy Ramos (Secretary for Personnel) does not vet resumes higher than her pay grade and Gisela Ruiz (Director of Personnel) did not make hiring decisions in terms of who was qualified. (Pl. Resp. R. Stmt. 56.1 ¶ 135.) Plaintiff also notes that the posting required that resumes go to Susan Carr, who did not fill out a declaration in this instance. (*Id.*; Def. Ex. RR.)

of "the pattern ... you just do not get interviewed ... you keep on being passed over." (Jimenez Dep. 72:25–73:2.) The Plaintiff disputes Mr. Muscaciulo's assertion that he does not possess any of the preferred skills listed for this position in his Local Rule 56.1 Statement, but offers no evidence that he actually did. (Pl. Resp. R. Stmt. 56.1 ¶ 138.)

### 16. Selection of Maria Collymore for Housing Development Specialist L–2 (Director Of Senior Citizen Rent Increase Exemption) (806–06–147)

In or about May 2006 Jimenez contends that he submitted a cover letter and resume for the vacant Housing Development Specialist L–2 position, carrying the inhouse title of Director of Senior Citizen Rent Increase Exemption ("SCRIE"). (Jimenez Dep. 85:3; Pl. Ex. 25–27.) The Plaintiff met the job posting's minimum qualifications because he held a baccalaureate and a master's degree in public administration and more than two-years of satisfactory full-time professional experience analyzing housing programs. (Def. Ex. YY; Def. Ex. C.) The job listing stated that the hired candidate would be involved in the implementation of the SCRIE Program, including the processing and computerization of applications and all related issues. (Def. Ex. YY.) The vacancy notice stated that the selected candidate would respond to inquiries from staff, various outside groups and managing agents regarding SCRIE, prepare reports and respond to correspondence within required deadlines. (Id.)

Assistant Commissioner Julie Walpert assigned staff members to sort through the pool of resumes and interview candidates who had experience in the SCRIE program. (Walpert Decl. ¶ 3.) After that, Elaine Smith and Gary Sloman recommended, and Walpert subsequently selected, Maria Collymore for the position. (Id.

at 4–6.) Plaintiff disputes Walpert's Declaration as hearsay contending that there are no declarations from anyone from Ms. Walpert's staff. (Pl. Resp. R. Stmt. 56.1 ¶ 155.) At the time of her hiring, Ms. Collymore was an African–American female in her mid–30s. (Id.) Ms. Walpert was forty-one years old at the time she made the decision to promote Ms. Collymore. (Walpert Decl. ¶ 8.)

Walpert declared that Collymore was the best candidate for the position because "she was already employed in DHS as a Special Projects Associate as of January 2004 and has experience in planning and analysis, and had coordinated various efforts and programs within DHS." (Walpert ¶ 6.) Walpert went on:

> during her tenure with DHS, I had the opportunity to observe Ms. Collymore's performance first hand and knew her to be a fast learner, self starter, excellent at motivating the staff, very intelligent and an individual who could be trusted with confidential matters. Further, throughout her time with DHS, Ms. Collymore routinely took on additional responsibilities as assigned and at her request, and had distinguished herself as a superior employee.

(Id.) Ms. Walpert cites the EEO Worksheet to note that there is no record that Plaintiff submitted an application/resume for this position. (Id. at ¶ 7; Def. Ex. AAA.)

Plaintiff contends that Walpert's declaration is hearsay because it does not come from the people who actually sorted through the resumes, The declaration is not hearsay. Walpert testified about what she told her staff to do. She gave them instructions; it is not hearsay for her to so testify.

Plaintiff states that he was more qualified for this position then Ms. Collymore,

noting that she worked as a high school teacher and a research assistant before coming to HPD. (Pl. Resp. R. Stmt. 56.1 ¶ 155.) Plaintiff testified that the reason he believes that he was discriminated against and not promoted to this position because of his race was "we can go back to the pattern of, you know, no interviews and that is it. You don't even get to that point." (Jimenez Dep. 86:15.) Jimenez testified that there was nothing that led him to believe that he was discriminated against because of his national origin and/or his age. (Jimenez Dep. 86:22–87:4.)

### 17. Selection of William Carbine for Assistant Commissioner, DAA (806–06–156)

In or about May 2006, Jimenez contends that he again applied for the vacant Assistant Commissioner of the Division of Anti–Abandonment position. (Jimenez Dep. 87:22; Def. Ex. BBB.) The Plaintiff met the job posting's minimum qualifications because he held a baccalaureate degree, a master's degree in public administration and more than four years of satisfactory full-time professional experience analyzing housing programs. (Def. Ex. BBB; Def. Ex. C.) The job listing stated that the hired candidate would, among other duties, supervise the day-to-day operations of DAA program units, be responsible for the oversight of forty-four not-for-profit housing organizations that assist DAA borough offices in their preservation work, and coordinate research and analytical efforts to define the nature of the housing problems.

Deputy Commissioner Luiz Aragon had his Human Resources Unit collect and vet resumes of applicants to ensure they met the basic credentials of the posting. Aragon then reviewed resumes, interviewed and recommended to First Deputy Commissioner John Warren that William Car-

bine should be selected for the position.[5] (Aragon Decl. ¶ 16.) Aragon, a Hispanic, was forty-seven years old at the time he made the decision to promote Carbine. (Aragon Decl. ¶ 19.)

Aragon testified that Carbine was the best candidate for the position because "he had significant experience at HPD at a high level ... and has always performed at the highest level and developed a reputation in the agency as a hard worker an individual who could problem solve and address varying issues with poise and an eye on the final goal." (Aragon ¶ 17; Def. Ex. CCC.) Aragon went on:

> Mr. Carbine also has a great deal of diverse experience in operations, contracting, procurement, budgetary matters, served as a liaison with various not-for-profits and communities and possessed a strong managerial background at varying levels. In addition, Mr. Carbine was a very good communicator and an individual whom I believed would be able to effectively handle the duties of the Assistant Commissioner of DAA.

(*Id.*) Warren echoed these sentiments in his Declaration. (Warren Decl. ¶ 20.)

While Aragon does not recall receiving or reviewing Jimenez's application for the position, upon later reviewing Plaintiff's resume, he explained that Jimenez, "had no substantive experience handling large budgets, had far less experience working with the community groups and not-for-profit groups, and possessed no discernable knowledge of the City's tax policies or procurement procedures." (Aragon Decl. ¶ 17; Def. Ex. C; *see also* Warren Decl. ¶ 21.)

Plaintiff contends that he was performing these very job duties in his job title. (Pl. Resp. R. Stmt. 56.1 ¶ 162.) Plaintiff also contends that this was not a pro-

---

**5.** The same absurd hearsay argument is made about Aragon's declaration.

motion for Carbine, but a lateral transfer from his previous position as Assistant Commissioner of Strategic Planning, He claims it was pre-determined that Carbine would be selected for the position, minimizing anyone else's chances regardless of their qualifications. (*Id.*) Plaintiff notes that Mr. Carbine was given $115,000 in this position, and when Mr. Pechefsky was hired for the same position he was only making $100,000. (Pl. Ex. 29, 30.) Plaintiff also asserts that this position did not require handling large budgets, and notes that after filing his EEOC charge. Plaintiff received expanded duties with a budget over $6 million, dealing with forty-four community groups. (Pl. Resp. R. Stmt. 56.1 ¶ 165.)

Plaintiff believes he was discriminated against and not promoted to this position due to his race was "Mr. Bill Carbine, you know, who was the one appointed to the position is a white male," and "this is the second time that I have applied for the position, you know, a while male appointed to the position." (Jimenez Dep. 89:7–21.) Jimenez testified that he believes he was discriminated against because of his national origin because "again, Mr. Carbine is Italian and I think Mr. Pechefsky, I don't know his national origin but not my national origin." (Jimenez Dep. 90:2.) Jimenez testified that he believes he was discriminated against because of his age because "again, they are younger, white male," and that be thinks that Mr. Carbine is younger than him. (Jimenez Dep. 90:7–13.)

18. **Selection of Alexandra Sewell for Legislative Assistant in the Division of Policy and Program Analysis of HPD (806–06–170)**

On or about June 19, 2006, Jimenez contends that he applied for the vacant Legislative Assistant in the Division of Policy and Program Analysis of HPD position. (Jimenez Dep. 94:15; Def. Ex. DDD; Pl. Ex. 39.) The Plaintiff met the job posting's minimum qualifications because he held a baccalaureate degree and more than four years of satisfactory full-time professional experience in the development of government subsidized housing programs. (Def. Ex. DDD; Def. Ex. C.) The job listing stated that the candidate hired would be responsible for reading, understanding, and interpreting federal statutes and rules that apply to HPD's programs and that affect the housing stock of New York City, serving as primary liaison with New York City's Washington, DC lobbying office to insure that HPD's issues are understood and properly advocated in the federal legislative and budgetary process, and serving as liaison with the New York City Office of Management and Budget and other national state and local organizations in relation to federal housing policy issues. (Def. Ex. DDD.)

Special Counsel for HPD, Harold Schultz reviewed all resumes and interviewed fifteen candidates, from whom he selected Ms. Alexandra Sewell for the position. (Schultz Decl. ¶ 5.) Schultz has no record that Jimenez applied for this position. (*Id.* at ¶ 8, Def. Ex. EEE.)

Schultz declared that Sewell was the best candidate for the position because "she had extensive experience in the Federal budgetary system, having worked as a staff member of the United States Senate Committee on Appropriations for several years where she advised members of . . . [various committees] on policy and budgetary matters." (Schultz Decl. ¶ 6; Def. Ex. FFF.) Schultz continued that Sewell had:

intimate knowledge of housing appropriation issues and how it worked on a federal level, including how the U.S. Senate operated, having interacted and advised member of the U.S. Senate and their staff on varying housing issues,

many of which directly affected HPD's federal allocation which totals in excess of five-hundred million dollars. In addition, Ms. Sewell was tremendously articulate, very conversant and versed on the federal legislative issues pending in Washington, DC and had very good relationships with individuals who were important to HPD issues. (*Id.* at ¶ 6–7.) Deputy Commissioner Joseph Rosenberg, Schultz's counterpart, echoed similar sentiments in his Declaration. (Rosenberg Decl. ¶ 5–7.)

While Schultz does not recall receiving or reviewing Jimenez's application for the position, upon later reviewing Plaintiffs resume, he explained that Jimenez "was not qualified for the position ... because he possessed absolutely no legislative experience. Mr. Jimenez had no experience working with the Federal appropriations or budgeting process, nor did he possess any lobbying experience and did not reflect any knowledge of the legislative process." (Schultz Decl. ¶ 8.) Mr. Rosenberg echoed these sentiments in his Declaration. (Rosenberg Decl. ¶ 8.)

Rosenberg was fifty-two and Schultz was fifty-nine years old at the time of their hiring decision. (Def. R. Stmt. 56.1 ¶ 176.)

Plaintiff provided a cover letter to prove that he applied for the position. (Pl. Ex. 39.) Plaintiff contends that neither legislative experience not local government experience was a requirement of this job posting. (Pl. Resp. R. Stmt. 56.1 ¶ 171.) He testified that he was in fact qualified and noted that two other Latino candidates, Lisa Osorio and Orlando Mendoza also were not interviewed. (Pl. Resp. R. Stmt. 56.1 ¶ 170; Def. Ex. EEE.)

Plaintiff testified that, during the application process, one of the secretaries mentioned in passing "To get ahead in this agency, you have to be white and young." (Jimenez Dep. 92:5–23.) He disclaims af-

ter he heard the secretary say that, "I knew basically I was not going to get an interview for the position." (*Id.*) Jimenez offers the secretary's comments as evidence that he was not promoted to this position because of his race, national origin and age. (Jimenez Dep. 93:18–95:4.)

**19. Selection of Elaine Toribio for Director of Policy Analysis and Operations (806–06–180)**

On or about June 26, 2006, Jimenez contends that he applied for the newly created position of Director of Policy Analysis and Operations. (Jimenez Dep. 95:19–96:20; Def. Ex. GGG.) The Plaintiff met the job posting's minimum qualifications because he held a master's degree in public administration and more than three years of satisfactory full-time professional experience supervising analytical and coordination work related to housing programs. (Def. Ex. GGG; Def. Ex. C.) The job listing stated that the hired candidate would be responsible for developing and supervising the implementation of administrative, personnel, budget, policy, and planning initiatives, providing analysis and recommendations for the implementation of new division related initiatives, and evaluating and overseeing the division's priority projects while working with the Assistant Commissioner to define the vision and goals that will guide the division's work. (Def. Ex. GGG.) In addition, Assistant Commissioner Miriam Colon, who reviewed candidates' applications and selected the hire for the position, declared that she "sought an individual who had a broad prospective and experience working with tax laden housing issues and who could easily read documents, analyze them and extract relevant information and make recommendations to me in order to assist in my decision making process." (Colon Decl. ¶ 4.) Ms. Colon selected Elaine Toribio for the position. (*Id.*)

Colon declared that Toribio was the best candidate for the position because "she worked at the Citizen Housing and Planning Council for several years as a Senior Policy Analyst where she reviewed and evaluated varying tax incentive programs, evaluated various housing programs and initiatives, and also had significant experience managing projects where she had to direct and supervise professionals at varying levels." (Colon Decl. ¶ 6.) Colon continued that Toribio was also "very successful in her prior position and received glowing recommendations from her references and other colleagues." (Id.)

While Assistant Commissioner Colon does not recall receiving or reviewing Jimenez's application for the position, upon later reviewing Plaintiff's resume, she explained that, "It was apparent that [Jimenez] was more of an analyst with some supervisory experience while the position of Director of Policy Analysis and Operations required a decision-maker and a policy shaper." (Id. at ¶ 7; Def. Ex. C.) Colon further commented that:

> plaintiff's resume does not reflect any experience or background in tax benefit programs, analysis of complex housing issues to effect policy and the ability to make sound recommendations to shape housing policy. While plaintiff possessed admirable skills, his resume does not reflect that he possesses experience running some of the larger programs in the units to which he was previously assigned.

(Id.) Colon is Puerto Rican and was fifty-six years old at the time of her decision to hire Toribio. (Id. at ¶ 8.) Upon Colon's information and belief, Ms. Toribio is also Hispanic. (Id. at 19.)

Plaintiff contends that the job posting does not discuss a need for experience dealing with "tax laden" issues. (Pl. Resp.

R. Stmt. 56.1 ¶ 179; Def. Ex. GGG.) Plaintiff also asserts that Ms. Toribio appears to be under forty, is of Dominican ancestry and is the only Latino to receive a promotion for any of the positions he applied for. (Pl. Resp. R. Stmt. 56.1 ¶ 179.) He notes that no Latino males have been hired for any of these positions. (Id.)

### 20. Selection of Jeffrey Geller for Project Manager, NYCHA Collaboration Program (806-06-189)

On or about July 17, 2006, Jimenez contends that he hand-delivered a cover letter and resume for the vacant Project Manager in the NYCHA Collaboration Program position. (Jimenez Dep. 100:5; Pl. Ex. 32; Def. Ex. III.) The Plaintiff met the job posting's minimum qualifications because he held a master's degree in public administration and more than one year of satisfactory full-time professional experience "working with the budget of a large public ... concern." (Def. Ex. III; Def. Ex. C.) The job listing stated that the candidate hired would be responsible for, among other things, reviewing analyzing and scoring development proposals solicited through a Request for Proposals, serving as expeditor for projects before and during construction, serving as a liaison with various divisions within HPD, reviewing and analyzing development budgets and projects' financing, working with the Director and others to bring projects to construction loan closing and construction completion and assisting the Director with tracking the flow of work for assigned projects. (Def. Ex. III.)

Resumes were collected and vetted by members of Assistant Commissioner Wendell Walters' staff, Ms. Nelva Taub and Administrative Assistant, Shayana Chambers, Resumes of candidates they found qualified were then forwarded to the Director, Wendy Reitmeier who reviewed them and interviewed candidates. (Wal-

ters Decl. ¶ 4.) She recommended Jeffrey Geller for the position. (*Id.*) Geller then participated in a second interview with Taub, who agreed with the recommendation. At which point Walters reviewed the qualifications of Mr. Geller and selected him for the position. (*Id.*) Plaintiff contends that it would be impossible to know the motive or intent of Nelva Taub, Shayana Chambers, and Wendy Reitmeier when they allegedly vetted and collected resumes for the position without any declarations from them. (Pl. Resp. R. Stmt. 56.1 ¶ 186.)

Walters declared that Geller was the best candidate for the position, because "he not only had the skills and experience my division sought in the successful candidate, but also brought a keen knowledge of real estate finance including underwriting, tax credit financing and financial modeling, strong interpersonal skills as well as excellent writing and computer skills." (Walters Decl. ¶ 6.) Walters continued that, "Mr. Geller earned a Master's degree in Urban Planning from Columbia University and was regarded as an individual who would come in and take the initiative needed to organize and implement the necessary procedures." (*Id.*) Walters was forty-four years old at the time of his decision to hire Geller. (*Id.* at ¶ 7.)

Walters stated that Plaintiff was never considered for the position because his division received the resume of July 19, 2006, two days after the posting period expired. Furthermore, upon later reviewing Plaintiff's resume, he explained that Jimenez's resume "does not evidence the financing and underwriting knowledge that was sought." (*Id.* at ¶ 6; Def. Ex. C.)

Plaintiff contends Geller's Master's in Urban Planning gave him no advantage over Plaintiff's Master's in Public Administration, together with credits toward his doctorate, and Plaintiff's sixteen years within the agency. (Pl. Resp. R. Stmt. 56.1 ¶ 187.) Jimenez testified that he believes he was discriminated against based on his race, national origin and age because. "again, · we go back· to the same pattern of not getting interviews and so on."

## McDONNELL DOUGLAS ANALYSIS

█ In each of the 20 instances discussed above, Plaintiff has satisfied his minimal burden of making out a prima facie case of discriminatory failure to promote on the grounds of race (Hispanic), national origin. (Puerto Rican) and age (over 40).

█ Plaintiff also satisfies the other three prongs of the four part prima facie case test. He testified that he applied for each of these positions. While defendant disputes that plaintiff applied for every one of the positions, plaintiff has come forward with some evidence (testimony— his own—or cover letters) for all 20 job postings. Viewing the evidence most favorably to him, that is sufficient at the prima facie stage.

Plaintiff has also established that he met the minimum educational and experiential qualifications for each of the 20 positions as well. Again, defendant argues that plaintiff was actually not qualified for some of the positions he sought—and makes a rather impressive argument on that score in a number of instances—but at the first step in the *McDonnell Douglas* analysis, plaintiff has done enough to satisfy his minimal burden.

█ Finally, in each instance, defendant held the job open and in the end filled it with someone else who was not a Puerto Rican Hispanic over 40 years old.

█ And so we move on to *McDonnell Douglas* step two. The City has satisfied its equally "non-demanding" burden, *Bick-*

*erstaff v. Vassar College,* 196 F.3d 435, 446 (2d Cir.1999), by offering evidence that the person who was chosen for the position was hired for reasons that qualify as both legitimate and non-discriminatory. In every instance the person who made the actual hiring decision testified that the applicant who was chosen had credentials superior to plaintiff's and explained why. For 13 of the 20 jobs, the person who was hired was already working with the person who made the hiring decision and was doing well in his/her current position. Six of the individuals chosen had particular expertise in an area that the hiring person deemed of particular importance (legislative policy, code enforcement, press relations, finance, underwriting, tax)—all areas of expertise that plaintiff either did not possess at all or did not possess to the same degree as the chosen candidate.

Plaintiff argues (implicitly) that, as regards some of the positions, defendant has actually failed to meet its *McDonnell Douglas* Stage 2 burden because it did not submit testimony from every individual who was directed to do preliminary vetting of resumes by a final decision-maker. He suggests that these individuals might have been biased against him for some reason forbidden by law. Going further, plaintiff contends that the declarations of the ultimate decision-makers are actually inadmissible "hearsay."

■ But it is not "hearsay" for an administrator testified to an instruction that he or she actually gave. And the testimony of a decision-maker that he ordered subordinates to screen resumes on legitimate grounds—as well as her testimony that she did not take race or nationality or age into account in making an employment decision (which is manifestly not "hearsay")—suffices to meet the employer's burden at the second stage, and so shifts the burden back *to plaintiff* to prove that

the decision-maker's testimony is false. The defendant bears no burden to prove that it did not discriminate; plaintiff must prove that defendant did discriminate. *See Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089. It thus rested with plaintiff to obtain evidence that underlings who screened resumes were using legally forbidden criteria to weed out candidates. Plaintiff submits no evidence to support that supposition; he merely speculates that they might have done so. That is not sufficient to bar summary judgment for HPD.

Because defendant has satisfied its Step 2 burden, it rests with plaintiff to establish that the reasons given for hiring these individuals are not the real reasons, but rather are pretexts for discrimination against him on the basis of his race, national origin or age. Plaintiff must offer evidence to support an inference of discrimination; mere conjecture will not do. It is not enough for plaintiff to assert, "I am a Puerto Rican Hispanic over 40 and I did not get the job, and neither did anyone else like me; I thus must have been passed over because of my race, nationality and/or age." *See Gupta v. New York City School Const. Authority,* 2007 WL 1827418 at *4 (E.D.N.Y. June 25, 2007) ("Plaintiff's only claim seems to be that the individual who got the job instead of him was younger and of a different race and national origin. Plaintiff has not put forth any other information that even hints at discrimination.")

■ A plaintiff can demonstrate pretext by offering either direct or circumstantial evidence of discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In this case, plaintiff has offered not a scintilla of direct evidence of discrimination. He testified to hearing one or two "stray remarks" from unidentified low level individuals in a cou-

ple of departments, but that is absolutely all. But such stray remarks are not probative of discrimination against him, as plaintiff offers not the slightest evidence that the comments are attributable to any decision-maker or were made in the context of the making of the employment decision. *Schreiber v. Worldco, LLC,* 324 F.Supp.2d 512, 519 (S.D.N.Y.2004).[6]

■ Instead, Plaintiff argues that discrimination can be inferred from his repeated failure to be interviewed or selected for the jobs for which he applied. Put otherwise, he contends that what he perceives as the "pattern and practice" of not selecting him for positions demonstrates that he was discriminated against, on the basis of his race, nationality and age, in each of the 20 instances under review.

I am not persuaded by plaintiff's argument. It has never been held, by the Second Circuit or by any other Court of Appeals, that the sheer number of failures to select a plaintiff for a job, without more, is enough to raise a genuine issue of fact on the issue of pretext. Courts in this district and elsewhere have repeatedly held that the "sheer number" argument is insufficient to raise a genuine issue of fact concerning pretext. *See Ghosh v. New York City Dep't of Health,* 413 F.Supp.2d 322, 324, 334–38 (S.D.N.Y.2006); *Williams v. State of New York Office of Court Administration,* No. 80 Civ. 4717(CSH), 1987 WL 5832, at *9, 1987 U.S. Dist. LEXIS 315, at *24 (S.D.N.Y. Jan. 22, 1987); *see also, Oliver–Simon v. Nicholson,* 384 F.Supp.2d 298, 314 (D.D.C.2005); *Hen-*

*dricks v. Paulson,* 520 F.Supp.2d 65 75–76 (D.D.C.2007) ("sheer number of positions for which [plaintiff] applied but was rejected" did not raise an issue of fact precluding summary judgment where plaintiff did not produce sufficient evidence to show that she was substantially more qualified than selected applicants).

Most recently, in *Milano v. Astrue,* 2008 WL 4410131 (S.D.N.Y. Sept. 26, 2008), the court was faced with facts uncannily like those in Jimenez's case. The plaintiff in Milano, like Jimenez, applied repeatedly for any available GS–14 position at the Social Security Administration. In *Milano,* the plaintiff was deemed among the best-qualified applicants for every position to which he applied—something that certainly cannot be said of plaintiff here. But he was not selected to fill any position. Milano, like plaintiff here, argued that being passed over for promotion 20 times (exactly the number at issue in this case) raised an inference of discrimination. In an opinion written by Magistrate Judge Freeman and adopted by Chief Judge Wood, the court rejected Milano's argument and granted defendant's motion for summary judgment. *Milano,* 2008 WL 4410131 at *38. Magistrate Judge Freeman pointed out that, in *Ghosh,* Judge Marrero had granted summary judgment for the employer when the plaintiff had been rejected for promotion to 85 different positions; and in *Williams,* Judge Haight granted summary judgment for the employer as to 21 of the 24 situations (re-

---

6. Plaintiff testified about three different remarks; one made by a person identified only as a secretary when he expressed an interest in the position of Legislative Assistant in the Division of Policy and Program Analysis of HPD ("To get ahead in this agency, you have to be white and young"); one made by an unidentified person when he expressed interest in the position of Director of Operations

for the Housing Education Services Unit ("The person in charge of the housing education services she was intent in bringing African Americans under her umbrella and that is what she was interested in hiring"); and one made by unidentified person(s) about no job in particular ("If you're not white you don't get too far here no matter what qualifications you may have").

ferred to as "selections") in which plaintiff was not chosen for a new job.

Plaintiff is unquestionably ambitious. Over the course of the four year period examined in this opinion, he appears to have applied for every open executive level position at HPD—and at least one that was arguably not executive level. For some of those positions, plaintiff was indisputably qualified. For others, he was indisputably not qualified—or, at least, was so much less qualified than the successful candidate as to render it impossible for a *rational* trier of fact to infer that discrimination was the reason he was not selected. From the undisputed evidence, it appears that plaintiff applied for promotions indiscriminately—including to jobs that he had no reasonable prospect of obtaining—and he is upset about his lack of success. But as the court observed in *Oliver–Simon v. Nicholson,* supra, "Although several nonselections may be disheartening for plaintiff, the sheer number of non-selections alone is not sufficient to establish that defendant's proffered justifications were a pretext for discrimination." It would make no sense if a plaintiff could raise a genuine issue of fact *as to pretext* simply by applying to and being rejected for numerous jobs, without regard to whether his qualifications for each job were markedly superior to of others who were considered for each job.

Here, the logical fallacy in plaintiff's argument is compounded by the undisputed fact that the 20 separate decisions not to promote him were made by 19 different decision-makers in 16 different units or offices within HPD. Plaintiff has adduced absolutely no evidence of any conspiracy among these various decision-makers; he has not even introduced evidence that any two of those decision-makers ever spoke to each other concerning plaintiff's many job applications. Nor has plaintiff introduced

any evidence of any agency policy binding on all these different decision-makers, or of any widespread practice within HPD, that disfavored people of Hispanic or Puerto Rican origin who were older than 40. The evidence does not reveal how many people applied for many of these jobs, or what their qualifications were, or what their nationalities/races were, or how old they were. It does reveal that the jobs were not all filled with white men under 40: there were many instances when candidates who were older than 40 were selected for positions, and members of minority groups (including one Hispanic) were selected to fill the positions. Thus, plaintiff has not given the court any reason to conclude that there was some sort of policy or practice at HPD that would allow me to aggregate his twenty separate failed applications for analytical purposes.

The real issue in this case is not any "pattern or practice" it is whether plaintiff has managed to offer anything other than his own surmise to raise a genuine issue of material fact concerning any of HPD's 20 individual failures to promote him.

Plaintiff makes essentially the same arguments with respect to each of his unsuccessful applications. He argues that he was *more qualified than* the candidate who was selected in his stead. He points to his long tenure with the agency, his Masters in Public Administration and courses toward his doctorate, and his bilingual abilities, All those commend themselves to his employer; some of the decision-makers admit as much.

■ Unfortunately for plaintiff, employers enjoy "unfettered discretion to choose among qualified candidates" and to decide which types of credentials are of the most importance for a particular job, and courts defer to employers to select what criteria are important to them when evaluating the issue of pretext. *Byrnie v.*

*Town of Cromwell Bd. of Ed.*, 243 F.3d 93, 103 (2d Cir.2001). In order to survive a motion for summary judgment, an employee asserting that his employer's proffered explanation is a pretext for discrimination based on his supposedly stronger qualifications must demonstrate that his credentials are "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the [employee] for the job in question." *Id.*

The court has gone to great lengths in this opinion to set out the qualifications of every person who was selected for a position to which plaintiff aspired. I find very few instances in which plaintiff's credentials were even arguably superior to those of the suggested candidate—let alone so markedly superior that no reasonable trier of fact would have made the same decision as the hiring person.

A couple of examples suffice to demonstrate the weakness of plaintiff s "better qualified" argument. Jimenez's credentials for the position of Special Assistant to the Chief of Staff were not "so superior" to those of the successful candidate, Katherine McCracken. McCracken has years of experience with press relations, including experience as the Press Secretary for the Governor of Missouri and for the New York City Department of City Planning. Plaintiff had no such experience. Indeed, his principal complaint about McCracken seems to be that she had moved to New York only two years earlier; but length of residency was not a qualification for the position, and plaintiff clearly values his long tenure at the agency more than his employer does.

Similarly, while plaintiff met the minimum qualifications for the position of Assistant Commissioner for the Division of Alternative Management Programs, his credentials were not "so superior" to those of Wendell Walters, as Director of the Neighborhood Entrepreneur Program had been responsible for one of the largest units in the Division of Alternative Management Programs for six years.

Plaintiff complains that some of the "superior" credentials and experience possessed by successful candidates were in areas or skills that were not emphasized (or even mentioned) on the job posting. But because the employer is free to weigh credentials as it wishes, the fact that some decision makers relied on credentials or experience that were not listed on the job posting announcement does not give rise to any inference that they were engaged in impermissible discrimination. A posting notice sets forth minimum and preferred qualifications, but the law does not require that only credentials listed on a job posting can be considered when filling a position. The fact that certain types of experience are considered more desirable or valuable than educational and employment attainments like plaintiff's does not evidence discriminatory animus. If the law allows an employer to prefer a candidate on the ground that it would cost less to hire that person—and it does, *see Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 117 (2d Cir.1991)—then it is perfectly permissible for an employer to conclude that someone who has experience interpreting housing codes would be a better hire than someone who has a longer tenure with the agency but no experience interpreting codes. This is true even if "code interpretation" is not specifically identified in a posting as a desirable qualification.

Plaintiff also argues that some of the job postings were "sham," because an inside candidate was destined (or all but destined) to get the job from the outset. That an insider might enjoy some advantage in applying for a position is neither surpris-

ing nor evidence that raises a genuine issue of fact as to pretext. Familiarity with a person's work is but another kind of credential, and it does not violate the law for a decision-maker to prefer someone whose work he or she already knows and likes to an outsider whom he/she knows only through a resume and an interview. Jobs have to be posted even if someone has the inside track; in those circumstances, the real purpose of the search is simply to see if there is anyone "out there" whose qualifications are so markedly superior to the insider's as to place in doubt a predisposition in favor of the known candidate.

In this case, there is no evidence that plaintiff's paper credentials for any of the jobs taken by "inside track" candidates (Karin Allen, David Rouge, William Carbine) were markedly superior to those of the candidate who may have had an "edge" because they enjoyed a prior working relationship with the decision-maker. Furthermore, "Even if the court were to credit plaintiff's allegation that [applicants were] pre-selected, that fact does not give rise to an inference of discrimination without evidence that [the pre-selections] were somehow discriminatory." *During v. City University of New York*, 01 Civ. 9584(BSJ), 2005 WL 2276875, at *7 (S.D.N.Y. Sept. 19, 2005). Plaintiff offers no such evidence.

After carefully examining the evidence set forth above, I conclude that plaintiff has failed to raise any genuine issue of fact concerning the superiority of his credentials over those of the successful candidate for 18 of the 20 job postings that are at issue in this lawsuit. He has, however, raised an issue with regard to two of the positions: Director of Planning and Administration (14), which went to Celaj, and Assistant to the Deputy Commissioner for Housing Operations (11), which went to Kathleen Mullin.

■ As to the former: plaintiff raises a genuine issue of fact concerning the superiority of his credentials to those of the successful candidate. He notes that much of Celaj's experience was in fields that the job posting said were not relevant experience. Celaj's resume indicates that, from 1993 until his hire in 2006, he held three different jobs in private real estate ventures. From May 1990 through July 1993, Celaj worked as a merchants' coordinator for a private development corporation. For the next six years, Celaj was a real estate broker and owner handling responsibilities such as building management, mortgages, and sales. Beginning in October 1999 and until he was hired by HPD in 2006, Celaj worked for Pride Property Management, where he supervised resident property managers, created budgets for co-ops and condominiums, negotiated contracts with vendors and co-op boards of directors and reviewed financial data. All this is commercial real estate experience relating to sale, lease, rental or management. According to the job posting, said experience is not relevant for the job. If one subtracts this from Celaj's resume, he appears to have very little relevant experience. Furthermore, plaintiff testified that he had to train Celaj when the latter came on board; accepting this testimony to be true (as I must on defendant's motion for summary judgment), it underscores the lack of pertinence of Celaj's extensive experience as a manager of commercial real estate in the private sector. And Celaj received a tremendous increase in his annual income (from $25,000 to $80,000) when he took the job. Therefore, plaintiff has raised a genuine issue of fact concerning pretext. *See Hendricks v. Paulson, supra*, 520 F.Supp.2d at 75–76.

■ As for the job of Assistant to the Deputy Commissioner for Housing Operations, which went to Mullin: relative quali-

fications are actually not disputed. It appears to be agreed by all concerned that plaintiff's qualifications were superior to Mullin's. The decision-maker, LoPrimo, actually said that plaintiff was overqualified for the position, because "he was already functioning as a Deputy Director. Therefore, in my estimation, this position was below his level of experience and skills." If that is true, then refusing to hire plaintiff for the position was completely legitimate.

There are two disputed issues concerning posting (11). The first is whether the job is an "entry level" position, as LoPrimo contends, and so would have represented a step backward for plaintiff. I conclude that this issue must go to a jury.

When Jimenez applied for the position of Assistant to the Deputy Commissioner for Housing Operations, around September 2005, the pay scale for the job he then occupied (Deputy Director of Special Projects in the Division of Anti–Abandonment) ranged from $47,604 to $74,118; he was receiving $63,439 at the time. The pay scale for the Assistant to the Deputy Commissioner for Housing Operations position in question was $49,778 to $74,118—a virtually identical salary. This evidence is sufficient to raise a question of fact concerning whether Mullin's job would have been a "demotion," or whether Plaintiff was "overqualified" for this position. Furthermore, I find no evidence in the record about the salary at which Mullin was hired; if she was hired in at more than $63,500, then HPD cannot even argue that hiring her saved money.

Of course, none of this is relevant if Plaintiff never applied for Mullin's job. This, too, is disputed. Plaintiff insists that he did; LoPrimo claims to have no such recollection.

There is sufficient evidence in the record to suggest defendant's proffered reason for hiring Mullin (that this was an "entry level" position) is a pretext of discrimination.

■ The only other position where the "superior qualifications" argument might arguably have resonance is the position of Deputy Director of the LEAD COTA Squad. The posting specifically expressed a "preference" for candidates who were bilingual, but the job was given to a candidate who did not speak Spanish. Instead, the successful candidate, Michael Murphy, was already certified as a lead inspector by the Federal Government. Plaintiff would have had to obtain certification in order to take the position. It is well settled that "a preferred skill is not equivalent to a prerequisite," *Ghosh*, 413 F.Supp.2d 322, 333 (S.D.N.Y.2006). For this particular position, it cannot be said that plaintiff's bilingualism was a skill markedly superior to Murphy's lead inspection certification. Therefore, plaintiff has failed to raise a genuine issue of fact on the issue of pretext.

Accordingly, defendant's motion for summary judgment is granted to the extent of dismissing plaintiff's claims relating to all positions except Director of Planning and Administration and Assistant to the Deputy Commissioner for Housing Operations.

### Retaliation

Defendant's claims for retaliation under Title VII and the NYCHRL relate to the lateral transfer plaintiff actually got—a transfer to the position of Deputy Director of Contracts. Plaintiff alleges that, after he filed his charge with the EEOC, he received this position, but was not given an immediate pay increase, to which he would ordinarily have been entitled. He contends that this constitutes retaliation for the filing of his charge.

Plaintiff filed his charge with the EEOC on May 11, 2006. He officially assumed the new position in February 2007—nine months later—but did not receive a pay increase until June 2008. Defendant asserts that Jimenez was not given an immediate pay increase because his job performance at the time of the promotion did not warrant it.

■ To make out a prima facie claim of retaliation, a plaintiff must prove that he engaged in a protected activity of which his employer was aware, that he was subjected to an adverse employment action, and that there was a causal connection between his protected activity and the adverse employment action. Under the NYCHRL the elements of retaliation are identical except that the plaintiff need not prove any "adverse" employment action; instead, he must prove that something happened "that would be reasonably likely to deter a person from engaging in protected activity." N.Y.C. Admin. Code Sec. 8–107(7).

Plaintiff indisputably engaged in protected activity of which his employer was aware, and he asserts that failing to give him a pay raise at the time he was promoted qualifies both as adverse employment activity and as something that would be reasonably likely to deter a person from engaging in the protected activity of filing an EEOC charge. I agree.

■ The real question at the prima facie stage is whether plaintiff has raised any genuine issue of fact concerning causation. He has not. For purposes of a retaliation claim, causation can be established in one of three ways: with evidence that the retaliatory action happened close in time to the protected activity; that other similarly situated employers were treated differently; or with direct proof of discriminatory animus. *See Sumner v. United States Postal Service*, 899 F.2d 203, 209 (2d Cir.1990). Plaintiff's only argument is that he filed his charge before he got the new job without a pay raise. He thus relies on the first of these three theories.

■ The fact that protected activity preceded the allegedly retaliatory act, without more, is insufficient to defeat a motion for summary judgment. In this circuit, the plaintiff must also establish temporal proximity—that the allegedly retaliatory act was sufficiently close in time to the protected activity as to raise an inference that the latter caused the former. *See Hollander v. Am. Cyanamid Co.*, 895 F.2d 80 (2d Cir.1990). In general, when more than three months have passed between a protected activity and an allegedly retaliatory response, the Second Circuit has deemed the evidence insufficient to raise an issue of fact concerning causation. *Id.*, 895 F.2d at 86. This court dismissed retaliation claims concerning adverse employment actions that took place within six months and eleven months of protected activity. *See Yarde v. Good Samaritan Hosp.*, 360 F.Supp.2d 552, 562 (S.D.N.Y.2005). *Tasadfoy v. Ruggiero*, 365 F.Supp.2d 542, 551 (S.D.N.Y.2005).

■ Here, the failure to accompany Jimenez's lateral transfer with a pay increase occurred nine months after he filed his charge—well outside the period when causation will be inferred as a matter of law. *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing with approval cases dismissing retaliation claims where adverse employment action followed protected activity by three to four months). Therefore, plaintiff fails to raise an issue of fact concerning causation and HPD's motion for summary judgment dismissing the retaliation claim must be granted.

Plaintiff also argues that every failure to promote him after he filed his charge on May 11, 2006 (a total of three applications, none of which is a position for which a viable discrimination claim remains in the case) was retaliatory. Plaintiff again relies solely on temporal proximity to raise an issue of fact: the filing of the charge preceded the failure to promote. But in these three cases, the failure to promote came within weeks of the filing of the charge—well within the three months window.

So the question is whether temporal proximity, without more, is sufficient to raise an issue of fact.

As discussed above, causation—the fourth and final element of a prima face case of retaliation—can be satisfied by proof of temporal proximity. By raising an issue of fact concerning causation, the burden shifts to defendant to offer a non-retaliatory reason why the plaintiff was not chosen for the job. The reason proffered in this context is identical to the reason offered on the discrimination claim: the candidates who were chosen had superior credentials.

So we ask whether plaintiff has offered any evidence tending to show that this reason is pretextual. As was discussed above, plaintiff has failed to prove that his credentials were "so superior" to those of the persons selected for these three positions.[7] But that is insufficient to warrant granting defendant's motion for summary judgment, because the question at *McDonnell Douglas* Stage 3 in a retaliation case is whether plaintiff has raised a genuine issue of fact concerning pretext *for retaliation*—not for discrimination. If the filing of plaintiff's charge motivated the decision-maker in whole *or in part*—even though the chosen candidate's qualifications are

superior to plaintiff's—the plaintiff is entitled to prevail.

However, in this case, plaintiff has not offered any evidence that tends to discredit HPD's explanation as pretextual.

■ First, plaintiff offers no evidence that the people who actually made the decision for these three postings (Harold Schultz, Joseph Rosenberg, Miriam Colon, Wendell Walters) were aware that he had filed a charge. Absent evidence that the decision-maker knew about the protected activity, it is impossible to infer retaliatory motive. That alone is enough to warrant granting defendant's motion for summary judgment.

■ Second, as plaintiff himself points out, he failed to be selected for numerous jobs before he filed his charge. The Second Circuit has held, "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir.2001). Since plaintiff can point to no direct evidence of retaliation, and relies entirely on temporal proximity, the fact that he failed to win promotion to numerous jobs before he filed his charge (all but two in circumstances that do not give rise to any inference of discrimination) is fatal to his retaliation claim.

### Hostile Work Environment

■ Finally, plaintiff asserts a claim for hostile work environment. However, he offers no evidence tending to show that his workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive

---

7. HPDs' rejection of Jimenez's application for the positions eventually given to Mullin and

Celaj occurred before he filed his charge, and so are not part of his retaliation claim.

to alter the conditions of [his] employment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000). Reduced to its essence, plaintiff's claim is that HPD was "hostile" because he kept being passed over for promotion. That is not a hostile work environment claim, but a restatement of his discrimination claim. The motion for summary judgment dismissing plaintiffs hostile work environment claim is granted.

### Section 1981 Claims

The only claims that will go to trial in this case are plaintiff's claims that he was discriminated against when Mullin and Celaj were selected to fill the positions of Assistant to the Deputy Commissioner for Housing Operations and Director of Planning and Administration, respectively. These claims are asserted under both 42 U.S.C. § 1981 and Title VII.

 Plaintiff's § 1981 claim is viable against his employer, the City of New York. *Jett*, 491 U.S. 701, 735–36, 109 S.Ct. 2702. A municipal entity can only be held liable under § 1981 if the plaintiff "can prove that the violation was committed pursuant to a 'policy, statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officer.' " *Bazile v. New York City Housing Authority*, 2002 WL 171690, at *16, 2002 U.S. Dist. LEXIS 1639, at *51 (S.D.N.Y. Feb. 1, 2002) (quoting *Monell v. Department of Soc. Svcs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see also Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir.1995). Plaintiff argues that defendant's repeated failure to promote him indicates a custom or policy on the part of the City of New York to discriminate on the basis of race, age and national origin.

 Obviously, the City of New York does not promulgate any official policy of discrimination along the lines plaintiff suggests. A trip to the City's web site reveals just the opposite; the City claims to be an equal opportunity employer. However, repeated actions can rise to the level of a policy if they are so consistent and widespread that they constitute a custom or usage sufficient to impute constructive knowledge of the practice to policymaking officials, or if the actions are directed or endorsed by someone who qualifies as a "policy-maker" for the City. *See Jett*, 491 U.S. 701, 735–36, 109 S.Ct. 2702. A policy-maker is someone who is responsible under state law for making policy in a particular area of a municipality's business. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir.2000).

 In this case, plaintiff fails to raise any genuine issue of fact on the policy question. As was discussed extensively above, the repeated failure to offer plaintiff to jobs for which his qualifications were not markedly superior to the selected candidates' does not raise any inference of a pattern or practice of discrimination on the part of the City of New York. "Absent a showing of a causal link between an official policy or custom an the plaintiffs' injury, [*Jett*] prohibits a finding of liability against the City.... the mere invocation of [a] pattern or plan [will] not suffice without a causal link." [8] *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983). Additionally, defendant submitted declarations from Deputy Commissioner of Administration Bernard Schwarz and Assistant Commissioner William Carbine re-

---

8. *Jett* "policy-making" analysis is identical to the more familiar *Monell* analysis for § 1983 claims against state actors.

futing plaintiff's assertion of a policy to deny promotions to older, Hispanic candidates of Puerto Rican national origin at HPD. The declarants identify nine instances between 2003 and 2007 when HPD either hired or promoted Hispanic applicants to supervisory and managerial positions. (*See* Schwarz Decl. in Further Support of Def. ¶ 2; Carbine Decl. in Further Support Def. ¶ 6.) Plaintiff offers no statistical or other evidence that would make this number disproportionately low compared to the pool of qualified applicants.

Furthermore, plaintiff has neither identified any of the persons involved in the decisions not to promote him who qualify as "policy-makers" for § 1981 purposes, nor linked anyone person who is responsible, under State law, for making personnel policy at HPD to the 20 decisions not to hire him, which were made by 19 decisionmakers who were working separately in various units and divisions at HPD. Having discretion to make a hiring decision, without more, is not enough to make a person a "policy-maker." *See Pembaur*, 475 U.S. at 481–82, 106 S.Ct. 1292.

For this independent reason, all of plaintiff's claims under § 1981 must be dismissed.

### Conclusion

For the reasons set forth above, defendant's motion is denied as to plaintiff's claims under Title VII, the Age Discrimination in Employment Act and the New York City Human Rights Law concerning the failure to promote him to the positions of Director of Planning and Administration and Assistant to the Deputy Commissioner for Housing Operations, and is otherwise granted.